**VERLINDEN B.V., Plaintiff,**

v.

**CENTRAL BANK OF NIGERIA, Defendant.**

**No. 79 Civ. 1150.**

United States District Court, S. D. New York.

April 21, 1980.

Berthold H. Hoeniger, New York City, for plaintiff.

Kissam, Halpin & Genovese, New York City, for defendant; James G. Simms, Leo T. Kissam, James H. Halpin, Laurence May, Peter J. Dranginis, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Verlinden B.V. ("Verlinden"), a Dutch corporation with its principal offices in Amsterdam, The Netherlands, commenced this action for anticipatory breach of an irrevocable documentary letter of credit established in its favor by the defendant Central Bank of Nigeria, and advised and payable by its correspondent bank, Morgan Guaranty Trust Company in New York. The defendant Central Bank of Nigeria ("Central Bank") is the central bank of the Federal Republic of Nigeria ("Nigeria") and is an "agency or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act ("Immunities Act") of 1976.[1]

---

1. 28 U.S.C. § 1603(b) (Supp.1979). The Act defines a "foreign state" broadly to include "an agency or instrumentality of a foreign state." Id. § 1603(a). We follow that usage here. The substantive provisions of the Act are codified in 28 U.S.C. §§ 1602–11. To

Although the instant action is based upon the alleged breach and repudiation by Central Bank of its obligations with respect to the irrevocable letter of credit, in order to put the matter into proper perspective, it is necessary to refer to events prior and subsequent to its issuance. On April 21, 1975, plaintiff entered into a contract whereby Nigeria agreed to buy from plaintiff, 240,000 metric tons of Portland Cement for the price of $U.S.60 per ton, or a total of $14,400,000.[2] The Nigerian government agreed to establish, within 21 days after the contract was signed, "an Irrevocable, Transferable abroad, Divisible [3] and confirmed Letter of Credit in favour of the seller for the total purchase price through Slavenburg's Bank, Amsterdam, Netherlands." Shipment was to be made at the rate of 20,000 metric tons per month to commence 45 days after Verlinden had received the documentary irrevocable letter of credit in its favor. Demurrage was to be paid at "a rate not exceeding $3,500 *per diem*" per vessel, if and to the extent that discharge of the cargo was not completed at the rate of at least 1,000 tons per day. Demurrage payments were to accrue commencing on the first day after a vessel's arrival in the waters of Lagos Apapa, the port of Nigeria. The parties also agreed that the contract was to be governed by the Laws of the Netherlands and that disputes arising thereunder would be resolved by arbitration before the International Chamber of Commerce, Paris, France.

According to the allegations of plaintiff's amended complaint, on June 23, 1975 the defendant established its Documentary Credit No. CBN/BP/75/145 ("the letter of credit" or "the credit") in favor of plaintiff for the full contract price ($14,400,000); the credit included as well an open-ended amount for demurrage, to be paid at the rate of $3,500 per day per vessel. However, contrary to the terms of the cement agreement, the letter of credit was advised by and made payable through Morgan Guaranty Bank in New York, rather than plaintiff's bank (Slavenburg's) in the Netherlands. It was further at variance with the terms of the cement contract in that, as plaintiff alleges, it "was not confirmed, not divisible . . . internally inconsistent and commercially ineffective and unusable." Moreover, unlike the cement contract, the credit did not indicate when demurrage payments would commence. Plaintiff further alleges that in response to its request defendant, over a period of weeks, issued amendments to said letter of credit to render it internally consistent and commercially available and usable, as to which plaintiff was not advised by Morgan Guaranty until the latter part of September 1975. However, Morgan Guaranty did not confirm the credit as originally issued or amended, although it did advise plaintiff as beneficiary of amendments.[4]

In August 1975, the ports of Nigeria became bottlenecked with hundreds of ships carrying cargoes of cement, sent by more than 68 other cement suppliers from whom Nigeria had purchased cement. As a result of the increasing congestion in these ports, Central Bank commencing in mid-September 1975 unilaterally directed its correspondent banks, including Morgan, to adopt a

accommodate these new provisions, certain changes were made to the language of existing jurisdictional statutes; *see* 28 U.S.C. §§ 1332(a)(4) (diversity), 1391(f) (venue), 1441(d) (removal); and an entirely new section was added as well. *See id.* § 1330.

2. The contract was signed by the "Permanent Secretary, Ministry of Defense, Lagos . . . on behalf of the Federal Military Government of the Federal Republic of Nigeria."

3. The letter of credit was to be governed by the Uniform Customs and Practice for Documenta-

ry Credits (The International Chamber of Commerce Brochure No. 222) (1962 Revision). It provides that a "credit can be transferred only if it is expressly designated as 'transferable' by the issuing bank. Terms such as 'divisible' . . . add nothing to the meaning of the term 'transferable' and shall not be used." *Id.* Art. 46.

4. Morgan Guaranty was prepared to confirm the letter of credit as amended upon payment of its confirmation charges by plaintiff, the beneficiary, but these were not paid.

series of amendments to all irrevocable letters of credit issued in connection with the cement contracts. In essence, the advising banks were directed to stop demurrage payments against documents unless those documents had been sent to and certified for payment by Central Bank. Additionally, Central Bank directly notified the suppliers that payment would be accorded only for those shipments cleared and approved by Central Bank two months before their arrival in Nigerian waters. On September 30, 1975 Morgan Guaranty cabled Slavenburg's Bank in Amsterdam to advise plaintiff of these amendments. It can hardly be questioned—and the parties do not seriously dispute the fact—that these unilateral amendments to the irrevocable letter of credit constitute violations of the Uniform Customs and Practice for Documentary Credits the terms of which, by stipulation of the parties, are applicable.[5]

Plaintiff alleges that, in reliance upon the issuance of an irrevocable letter of credit as agreed upon, it contracted with another European concern, Interbuco Anstalt, Vaduz, Liechtenstein ("Interbuco"), for the purchase of cement and thereby exposed itself to a potential liability in liquidated damages. It seeks to recover damages for payments already made or owing to Interbuco, as well as its own lost profits, counsel fees and expenses in the sum of $4,660,000 as compensatory damages and punitive damages in a like amount.

Presently before the Court are the defendant's motions to dismiss the action for (1) lack of subject matter jurisdiction; (2) lack of in personam jurisdiction over Central Bank based upon sovereign immunity and the act of state doctrine; (3) its motion for summary judgment on the merits; (4) also its motion pursuant to Rule 60(b) to be relieved of an order directing that it instruct Morgan Guaranty to keep funds in a separate account sufficient to satisfy any judgment plaintiff may recover; and (5) plaintiff's renewed motion for the entry of default judgment based upon defendant's failure timely to file its answer.

I

Plaintiff alleges jurisdiction under section 2(a) of the Immunities Act, 28 U.S.C., section 1330, which, in pertinent part, provides:

§ 1330. .Actions against foreign states

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

Defendant's initial challenge is to plaintiff's assertion of jurisdiction under section 2(a) of the Immunities Act, contending that that provision does not empower a federal district court to adjudicate a dispute between foreign entities involving claims based upon a breach of a documentary letter of credit—which defendant contends, if American law applies at all, would be governed by the laws of the State of New York and not by the United States Constitution or any federal statute enacted thereunder.

It is not questioned that if jurisdiction exists it must be because the claim arises under either the Constitution or the laws of the United States. The parties agree that

---

5. *See id.* Art. 3, which provides:

An irrevocable credit is a definite undertaking on the part of an issuing bank and constitutes the engagement of that bank to the beneficiary or, as the case may be, to the beneficiary and bona fide holders of drafts drawn and/or documents presented thereunder, that the provisions for payment, acceptance or negotiation contained in the credit will be duly fulfilled, provided that all the terms and conditions of the credit are complied with. . . . Such undertakings can neither be modified not cancelled without the agreement of all concerned.

in this instance the framework of reference is a "law of the United States" since neither the Constitution nor any of the other bases for jurisdiction under Article III of the Constitution is applicable.[6] Thus an initial inquiry centers about section 2(a) of the Immunities Act upon which plaintiff in its complaint expressly asserts jurisdiction "is founded." The defendant's basic position is that the Act does not create the claim or right as alleged in plaintiff's complaint; that section 2(a) does not confer subject matter jurisdiction with respect to the Verlinden claim; that it is a procedural statute defining the limits of sovereign immunity and regulating the circumstances under which foreign states, and their agencies or instrumentalities, may be sued in American courts, both state and federal.[7] It contends that, like the Declaratory Judgment Act,[8] the Immunities Act only "enlarged the range of remedies available"[9] to a litigant but did not thereby enlarge federal jurisdiction to include "the kinds of issues which give right of entrance to federal courts."[10] According to this view, when Congress enacted the Immunities Act it did no more than affirm the already existing bases of jurisdiction—such as diversity or federal question—while eliminating the requirement of jurisdictional amount when the defendant is a foreign state. The hard core of defendant's argument is that plaintiff's claim for damages based upon an alleged breach of the letter of credit is one that normally would be adjudicated under state or common law, and unless it appears that the claim is based upon a federal right or a federal question this Court is without juris-

diction; in short, defendant contends that the claim must be grounded upon a federal right authorized by Congress as an essential element under a well-pleaded complaint, "unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose,"[11] —such as, in this case, sovereign immunity or the act of state doctrine. This restrictive concept, as Mr. Justice Frankfurter noted, was not "to indulge in formalism or sterile technicality" but reflected a deep concern that federal district courts would be inundated with a vast volume of litigation that normally should be adjudicated in state courts, merely because of an artfully pleaded complaint that anticipated defenses derived from federal law.[12]

Plaintiff responds that the Immunities Act is primarily a substantive federal statute—that Congress' purpose in passing the Act was to codify a single body of substantive, federal law governing assertions of sovereign immunity;[13] that although section 2(a), the jurisdictional provision of the statute, is cast in part in procedural terms, it incorporates by reference substantive criteria set forth in section 4(a).[14] Plaintiff emphasizes that these substantive criteria govern an area of law—foreign relations—that is uniquely federal in nature. In sum, the argument proceeds that since the Immunities Act is primarily substantive in that it makes fundamental substantive changes in the law of sovereign immunity, the claim asserted is one arising under a "law of the United States" within Article III of the Constitution under which the

---

6. Plaintiff concedes that the diversity statute is inapplicable.

7. The argument paraphrases the opening portion of the Act's legislative history. *See* H.R. Rep.No.94–1487, 94th Cong., 2d Sess. 6, *reprinted in* [1976] U.S.Code Cong. & Admin. News, p. 6604 (hereinafter cited as "*House Report*").

8. 28 U.S.C. § 2201 (Supp.1979).

9. *Skelly Oil Co. v. Phillips Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950).

10. *Id.*

11. *Id.* at 672, 70 S.Ct. at 879 (quoting *Taylor v. Anderson*, 234 U.S. 74, 75–76, 34 S.Ct. 724, 725, 58 L.Ed. 1218 (1914)).

12. *Id.* at 673, 70 S.Ct. at 879.

13. *See House Report, supra* note 7, at 7–8; *reprinted* at 6605–06. *See also id.* at 12; *reprinted* at 6610. *Cf. Behring International, Inc. v. Imperial Iranian Air Force*, 475 F.Supp. 383, 394 (D.N.J.1979).

14. 28 U.S.C. §§ 1605–1607 (Supp.1979) (defining sovereign immunity).

courts have federal question jurisdiction. Plaintiff emphasizes that, although state courts may continue to entertain suits against foreign states, they must apply federal substantive law, in assessing the validity of the sovereign immunity defense.[15] Thus, plaintiff argues that any complaint wherein jurisdiction is alleged under the Act requires for its correct determination the construction of the Act;[16] accordingly it is within federal jurisdiction. In further support of this, plaintiff points out that Congress obviously considered the likely increase in litigation by virtue of the Immunities Act since it eliminated the requirement of a jurisdictional amount in suits against foreign states in order "to encourage the bringing of actions against foreign states in Federal courts"[17] and also provided for removal of such actions from the state to the federal courts. In essence, then, resolution of the present dispute turns on whether Congress intended to make the issue of sovereign immunity a controlling question of federal law, and an essential, substantive element of the plaintiff's proof; or, as plaintiff has termed it, whether Congress intended to "federalize" all disputes in which foreign states are named as defendants. If it did, then, under plaintiff's theory, a foreign state could be sued under the Immunities Act by any plaintiff, regardless of its citizenship.

Plaintiff cites numerous cases and passages from the legislative history of the Immunities Act in support of its contentions. Of the cases cited, only one involved the Immunities Act and none sheds any light on the precise issue before the Court. Principal reliance is placed upon *Pfizer, Inc. v. Government of India*,[18] in which a five-member majority of the Supreme Court held that foreign nations could sue domestic corporations to recover damages for violations of the antitrust laws. Essentially, the issue there was whether a foreign sovereign nation was a "person" as that term is used in section 4 of the Clayton Act. Although the majority held that it was, they emphasized that the result reached did "not involve any novel concept of the jurisdiction of the federal courts"[19] since Congress had already specifically conferred jurisdiction upon the federal courts to entertain suits brought by foreign nations[20] and that to allow foreign nations to sue under the antitrust acts was "no more than a specific application of a long-settled general rule."[21]

None of the many other lawsuits brought in the aftermath of the Nigerian cement crisis[22] and cited by plaintiff is parallel to this action. In all but one of those brought in United States courts the plaintiff was a domestic corporation allegedly injured by

---

15. 28 U.S.C. § 1602 (Supp.1979).

16. *Ivy Broadcasting Co. v. American Telephone & Telegraph Co.*, 391 F.2d 486, 492 (2d Cir. 1968). *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 379, 5 L.Ed. 257 (1821) (Marshall, C. J.) ("A case . . . may truly be said to arise under the constitution or a law of the United States, whenever its correct decision depends on the construction of either.") *Cf. Smith v. Kansas City Title Co.*, 255 U.S. 180, 199–201, 41 S.Ct. 243, 245, 65 L.Ed. 577 (1921) (citing various tests of federal question jurisdiction).

17. Congress rewrote the federal jurisdictional statutes, eliminating the requirement of jurisdictional amount in suits against foreign states, in order "to encourage the bringing of actions against foreign states in Federal courts." *House Report, supra* note 7, at 13; *reprinted* at 6612.

18. 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978).

19. *Id.* at 318, 98 S.Ct. at 591.

20. 28 U.S.C. § 1332(a)(4) (1976).

21. *Pfizer, Inc. v. Government of India*, 434 U.S. 308, 319, 98 S.Ct. 584, 591, 54 L.Ed.2d 563 (1978).

22. *See, e. g., National American Corp. v. Federal Republic of Nigeria*, 420 F.Supp. 954 (S.D.N.Y.1976); *id.*, 425 F.Supp. 1365 (S.D.N.Y.1977); *id.*, 448 F.Supp. 622 (S.D.N.Y.1978), *aff'd*, 597 F.2d 314 (2d Cir. 1979); *East Europe Import-Export, Inc. v. Federal Republic of Nigeria and Central Bank of Nigeria*, No. 77 Civ. 2809 (S.D. N.Y.) (consolidating three cases) (decision pending); *Reale International, Inc. v. Federal Republic of Nigeria and Central Bank of Nigeria*, No. 78 Civ. 23 (S.D.N.Y.) (decision pending).

Nigeria's breach of the cement contract. Indeed, of the cases cited by the plaintiff, only two involved aliens on both sides of the dispute and neither is apposite. In *Ipitrade International v. Federal Republic of Nigeria*[23]—yet another of the Nigerian cement contract cases—a Swiss corporation sued in the United States District Court for the District of Columbia to enforce a final arbitration award against Nigeria pursuant to Swiss law and based upon the parties' agreement to submit all disputes to arbitration. Federal subject matter jurisdiction in *Ipitrade*, however, existed by virtue of a treaty for the enforcement of foreign arbitration awards to which the United States was a signatory and which had been incorporated into federal law.[24] Finally, plaintiff cites *Abdul-Rahman Omar Adra v. Clift*,[25] a custody dispute between alien parents of a Lebanese child living in the United States involving tortious conduct by one of the parties. In that case, federal jurisdiction explicitly was conferred by a statute[26] permitting aliens to sue in tort; moreover, the Court cited its inherent equitable powers to act on behalf of children found within its jurisdiction. In sum, none of these cases sheds any light on the instant issue.

The legislative history of the Immunities Act invoked by each party on its own behalf likewise provides no clear answer. Although the drafters of the Act proclaimed, among other matters, their intent to codify the restrictive principle of sovereign immunity[27] and to create a single uniform federal standard[28] they also stated that another purpose was to fashion a remedy for "American citizens," "U.S. businessmen" and "American property owner[s]" who "are increasingly coming into contact with foreign states and entities owned by foreign states."[29] The legislators repeatedly emphasized that they did not intend to create an international court of claims, and that the bill was "not designed to open up our courts to all comers to litigate any dispute which any party may have with a foreign state anywhere in the world."[30] Despite this somewhat contradictory and unilluminating legislative history, Professor Moore finds a "plain intention" on the part of Congress "to confer on the district court jurisdiction of an action *by an alien* against a foreign state if the action otherwise meets the requirements of that section."[31] However, the single section of legislative history cited to support that view does not, either expressly or impliedly, reflect Congress' "plain intent" on the precise jurisdictional question here at issue—whether subject matter jurisdiction was granted as to a claim asserted, not by a United States citizen, but by a foreign entity against a foreign state. A close study of the legislative history indicates that Congress did not consider or even discuss either vesting or limiting jurisdiction in the district courts where the claimant was a foreign entity.

Nonetheless, the view propounded by Professor Moore and plaintiff is not without support. While Congress' foremost concern was with actions by United States citizens against foreign sovereigns it does not follow that it necessarily intended to deny foreign citizens or entities access to our courts when they asserted claims against a foreign state. In fact, the legislative histo-

---

**23.** 465 F.Supp. 824 (D.D.C.1978).

**24.** Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201–208 (Supp.1979).

**25.** 195 F.Supp. 857 (D.Md.1961).

**26.** 28 U.S.C. § 1350 (1976). The paucity of cases brought under this statute is noted by Judge Friendly in *I.T.T. v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975).

**27.** *House Report, supra* note 7, at 7; *reprinted* at 6605.

**28.** *Id.* at 12; *reprinted* at 6610.

**29.** *Id.* at 6–7; *reprinted* at p. 6605.

**30.** Hearings before the Subcommittee on Administrative Law and Governmental Relations of the Committee on the Judiciary, House of Representatives, 94th Cong., 2d Sess., on H.R. 11315, June 2 and 4, 1976, p. 31.

**31.** 1 Moore's Federal Practice ¶ 0.66[4] at 700.-178–79 (1979) (emphasis supplied) (citation omitted).

ry reflects a purpose "to provide when and how *parties* can maintain a lawsuit against a foreign state."[32] The Congressional Report further commented that "there are no comprehensive provisions in our law to inform *parties* when they can have recourse to the courts to assert a legal claim against a foreign state."[33] To be sure the all inclusive references to "parties" by themselves hardly carry the day for the plaintiff's contention. But the language of section 1330 is broad and embracing. It confers jurisdiction over "any nonjury civil action" against a foreign state.[34] It neither limits such actions to those brought only by citizens of the United States nor does it exclude those brought by foreign citizens. The only delimiting test of jurisdiction contained in the express language of the statute is the requirement that the case have sufficient contact with the United States, considered hereafter.[35] Moreover, section 1330(a) must be read in conjunction with the new removal provision;[36] both are part of the "comprehensive jurisdictional scheme" enacted by Congress to foster "uniformity in decision"[37] in cases involving foreign states. The removal provision permits a foreign state named as a defendant in "*[a]ny* civil action brought in a State court"[38] to avail itself of a federal forum.

Clearly there are instances in which aliens may sue foreign instrumentalities in the state courts.[39] If the defendant's view of the Immunities Act were adopted, and aliens were barred from suing aliens in the federal courts, the purpose of the removal statute would be thwarted; a foreign state that removed an action might well find that the federal court had no jurisdiction over the case. That result would frustrate the Congressional purpose of concentrating litigation against sovereign states in the federal courts in order to aid the development of a uniform body of federal law governing assertions of sovereign immunity. It could hardly have been within the contemplation of Congress to permit removal in the instance of an action properly commenced in a state court by a foreign citizen against a foreign nation and to deny initial access to the federal courts to the same plaintiff.

█ In sum, although the Court is unable to discern any precedent or any articulated Congressional intention to grant subject matter jurisdiction in actions of this type in the federal courts, the language of the statute itself is controlling. That language is broad and inclusive. It incorporates into the concept of jurisdiction substantive, federal criteria for determining the validity of assertions of sovereign immunity. It imposes a single, federal standard to be applied uniformly by both state and federal courts hearing claims brought against foreign states. In consequence, even though the plaintiff's claim is one grounded upon common law, the case is one that "arises under" a federal law because the complaint compels the application of the uniform federal standard governing assertions of sovereign immunity.[40] In short, the Immunities Act injects an essential federal element into all suits brought against foreign states. That Congress may not have foreseen the result of its handiwork—that foreigners suing foreigners would be given access to a federal forum to litigate contract disputes—does not undo the broad language it wrote. We hold that the presence of aliens on both sides of this dispute does not de-

---

**32.** *House Report, supra* note 7, at 6; *reprinted* at 6604 (emphasis supplied).

**33.** *Id.* at 7; *reprinted* at 6605 (emphasis supplied).

**34.** 28 U.S.C. § 1330(a) (Supp.1979).

**35.** *See* 28 U.S.C. §§ 1603(d) and (e); 1605(a)(2) (Supp.1979).

**36.** *Id.* § 1441(d).

**37.** *House Report, supra* note 7, at 13; *reprinted* at 6611.

**38.** 28 U.S.C. § 1441(d).

**39.** *See, e. g., J. Zeevi & Sons v. Grindlays Bank (Uganda)*, 37 N.Y.2d 220, 371 N.Y.S.2d 892, 333 N.E.2d 168, *cert. denied*, 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975).

**40.** *See Ivy Broadcasting Co. v. American Tel. & Tel. Co.*, 391 F.2d 486, 492 (2d Cir. 1968) (citing cases).

prive the Court of subject matter jurisdiction.

## II

That determination, however, does not end inquiry. There remains for consideration the defendant's further motion to dismiss the complaint for lack of in personam jurisdiction. Subdivision (a) of section 1330, already cited, provides that the district court has jurisdiction:

> as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity . . . under sections 1605–1607 . . . .[41]

Subdivision (b) of section 1330, which the legislative history describes as in effect a federal long-arm statute over foreign states, their agencies and instrumentalities,[42] provides in pertinent part:

> Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) . . . .[43]

Thus, a foreign state is subject to district court in personam jurisdiction only in those instances where it is not entitled to sovereign immunity as specified in sections 1605–1607 of the Act. The enumerated exceptions to sovereign immunity set forth therein for the most part concern commercial activities by a foreign state having a nexus with the United States.[44] These substantive criteria were intended to embody the constitutional requirements of due process, which may only be satisfied if there are sufficient contacts between the litigant and the forum state.[45]

Section 1605(a)(2) defines three "commercial activity" situations in which a foreign state is not entitled to sovereign immunity and consequently in which the court has personal jurisdiction over a foreign state. These are when:

> ■ . . . the action is based upon a commercial activity carried on in the United States by the foreign state; [2] or upon an act performed in the United States by the foreign state in connection with a commercial activity of the foreign state elsewhere; [3] or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States . . . .[46]

Plaintiff asserts that its action is based upon each specified "commercial activity" and hence that it has satisfied the requirements of in personam jurisdiction.

The term "commercial activity", and its companion term, "commercial activity carried on in the United States by a foreign state," are explicitly defined by the Act:

> (d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

> (e) A "commercial activity carried on in the United States by a foreign state" means commercial activity carried on by such state and having substantial contact with the United States.[47]

*World-Wide Volkswagen Corp. v. Woodson,* —— U.S. ——, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Kulko v. Superior Court,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); *McGee v. International Life Insurance Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957); *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

**41.** 28 U.S.C. § 1330(a) (Supp.1979).

**42.** *House Report, supra* note 7, at 13; *reprinted* at 6612.

**43.** 28 U.S.C. § 1330(b) (Supp.1979).

**44.** There are other exceptions as well. For purposes of this motion, the most important of these is the waiver provision, 28 U.S.C. § 1605(a)(1), discussed in Part III, *infra.*

**45.** *See House Report, supra* note 7, at 13–14; *reprinted* at 6612. *Cf. Rush v. Savchuk,* —— U.S. ——, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980);

**46.** 28 U.S.C. § 1605(a)(2) (Supp.1979).

**47.** 28 U.S.C. § 1603(d) and (e) (Supp.1979).

We turn now to the plaintiff's contention that it comes within each of the three exceptions.

A. *"Commercial Activity Carried on in the United States"*

█ Plaintiff's initial contention is that Central Bank subjected itself to the jurisdiction of the United States courts by carrying on commercial activity within this country. To prevail upon this point, the plaintiff must identify a "regular course of commercial conduct" or a "particular commercial transaction or act" carried on here; demonstrate that this activity has "substantial contact[s]" with the United States; and prove that its cause of action is "based upon" the commercial activity.

Plaintiff's task is burdened by the fact that the underlying activity which gave rise to its claim of anticipatory breach of the letter of credit occurred outside the United States. The parties are foreigners. Plaintiff, a Dutch corporation, negotiated and executed the cement contract in Nigeria. Shipment of the cement was to be made from ports in Europe. Delivery was to be made in Nigeria. The work was subcontracted to Interbuco, a European concern. The express terms of both the contract and the credit provide for payment ultimately to be made in the Netherlands through Slavenburg's Bank. The parties agreed to resolve all disputes by applying foreign law in a foreign tribunal.

Like the contract, the credit involved activity carried on or consummated overseas. It was established abroad by a foreign bank; was to be advised abroad, to another foreign bank; and named a foreign beneficiary. It adopted many of the contract's substantive provisions, which were to be performed exclusively in Europe and Nigeria by foreign parties. Although it contained no choice of law or forum provisions, it hardly can be argued that the issuing bank (the defendant) and the beneficiary (the plaintiff) intended to invoke the benefits and privileges of American law,[48] or to select an American forum for the resolution of disputes arising out of the credit. Certainly there is no indication, either in the credit as originally issued or in any of the discussions preceding its amendment, that the parties ever contemplated such a result. Indeed, their agreement that Dutch law was to govern disputes under the contract suggests otherwise.

Nevertheless, plaintiff contends that Central Bank carried on "a regular course of commercial conduct" in this district which constituted substantial contact. It points to an entire series of transactions, involving vast sums of money, between Central Bank and Morgan Guaranty. There is no dispute over the fact that Central Bank kept large sums of U.S. dollars on deposit at Morgan, and that Morgan was authorized to draw on the defendant's behalf from accounts kept by Central Bank in the Federal Reserve Bank in New York. Moreover, Central Bank regularly advised letters of credit through Morgan; a number of these were issued in connection with cement contracts between the Federal Republic and suppliers other than Verlinden. Morgan confirmed several of these credits and thereby exposed itself to separate liability for breach of the credit's terms.[49] Furthermore, as part of its ongoing banking relationship with Morgan, the defendant sent several of its employees to Morgan for training in bank management. In short, there is ample evidence that both before and after the transaction at issue here, Morgan had a longstanding banking relationship with Central Bank, for whom it performed multifarious banking services within the United States.

---

48. *See Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958); *Carey v. National Oil Corp.*, 453 F.Supp. 1097, 1101 (S.D.N.Y.1978), aff'd, 592 F.2d 673, 676 n.7 (2d Cir. 1979); *Upton v. Empire of Iran*, 459 F.Supp. 264, 266 (D.D.C.1978), aff'd, 607 F.2d 494 (D.C. Cir. 1979).

49. *See* Art. 3, Uniform Customs and Practice for Documentary Credits (The International Chamber of Commerce Brochure No. 222) (1962 Revision).

Plaintiff argues that these actions, considered together, constitute "a regular course of commercial conduct" in the United States, and that that conduct has substantial contact with this country. For purposes of this motion, we assume that these assertions are true. We may even assume that these jurisdictional facts would be sufficient to justify a finding that Central Bank is "present" or "doing business"[50] in New York and thus would be subject to suit here if those traditional tests of jurisdiction applied. But they do not compel the same finding under the Act which here controls.

■■■ The Immunities Act rejected the traditional jurisdictional test of "doing business" and adopted instead the approach of the more recent long-arm statutes.[51] Specifically, the Act "is patterned after the long-arm statute Congress enacted for the District of Columbia."[52] Yet even the modern portion of the District's statute is only a guide to interpreting the Act, not a binding directive. There are significant differences in language and effect between the District's statute and the Act, which

Congress, the author of both, could not have overlooked. For example, jurisdiction under the District's long-arm statute exists whenever a foreign defendant (1) "*transact[s] business,*"[53] or (2) causes tortious injury within the District of Columbia by an act outside the District, "if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."[54] The first of these provisions has been interpreted to extend jurisdiction to the farthest reaches permitted by the due process clause;[55] the second, to permit jurisdiction even when the defendant's contacts with the District bear "no relation to the particular tort" that forms the basis of the cause of action.[56] Neither of these provisions has found its way into the Immunities Act. Instead, as to foreign states, Congress provided a much narrower basis for jurisdiction.[57] When jurisdiction is alleged under any of the Act's three "commercial activities" exceptions, the plaintiff's cause of action must be "*based upon*" the commercial activity spe-

---

**50.** See N.Y.C.P.L.R. 301 (McKinney's 1978). See also Gelfand v. Tanner Motor Tours, Ltd., 339 F.2d 317 (2d Cir. 1964), on remand, 385 F.2d 116 (1967); Frummer v. Hilton Hotels International, Inc., 19 N.Y.2d 533, 536, 281 N.Y. S.2d 41, 43, 227 N.E.2d 851 (1967) (citing cases).

The District of Columbia has a provision which dates from a time antecedent to the passage of the long-arm statute and which remains in force today. D.C.Code §§ 13–334 (1973). See Ramamurti v. Rolls-Royce Ltd., 454 F.Supp. 407, 409 n.2 (D.D.C.1978).

The sheer volume of a defendant's business in the forum state is not the decisive factor in determining whether jurisdiction exists, even under the traditional test.

It is the nature and quality of the relationship between the defendant and the forum that determines whether the exercise of jurisdiction is appropriate. See Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958); International Shoe Co. v. Washington, 326 U.S. 310, 319, 66 S.Ct. 154, 159, 90 L.Ed. 95 (1945). Cf. East Europe Domestic Intern. Sales Corp. v. Terra, 467 F.Supp. 383, 388–89 (S.D.N. Y.1979); National American Corp. v. Federal Republic of Nigeria, 425 F.Supp. 1365, 1369, 1370 (S.D.N.Y.1977); Textile Museum v. F.

Eberstadt & Co., Inc., 440 F.Supp. 30, 32 (D.D. C.1977).

**51.** See, e. g., N.Y.C.P.L.R. § 302 (McKinney's 1978); D.C.Code §§ 13–401 to 13–434 (1973).

**52.** House Report, supra note 7, at 13; reprinted at 6612.

**53.** D.C.Code § 13–423(a)(1) (1973) (emphasis supplied).

**54.** Id. § 13–423(a)(4).

**55.** See Margoles v. Johns, 483 F.2d 1212, 1218 (D.C. Cir. 1973); Dorothy K. Winston & Co. v. Town Heights Develop., Inc., 376 F.Supp. 1214, 1216 (D.D.C.1974).

**56.** Aiken v. Lustine Chevrolet, Inc., 392 F.Supp. 883, 885 (D.D.C.1975) (quoting Uniform Interstate and International Procedure Act, § 1.03(a)(4), 9B Uniform Laws Ann. 307, 312 (Commissioners' Notes) (1966)).

**57.** See Harris v. VAO Intourist, Moscow, 481 F.Supp. 1056, 1059 (E.D.N.Y.1979) ("[D]ue to the policy and language of the Immunities Act, the Act's bases of jurisdiction are less comprehensive than those found in the usual jurisdictional statutes of the states and the District of Columbia.")

cifically enumerated in the exception.[58] At least with respect to the first two exceptions, we take this to mean that there must be a close connection between the cause of action asserted and the jurisdictional facts upon which it is based.[59] Other contacts between a defendant and a forum state unrelated to a particular cause of action but that might justify the assertion of jurisdiction under the theories of "doing business," or even of "transacting business," do not satisfy the requirements of the Immunities Act. Rather, the focus must be on the nexus between the forum and the particular facts giving rise to the cause of action. In the instant case, the only relevant conduct of Central Bank which might support jurisdiction is the establishment of the Verlinden letter of credit and its decision to advise the credit to plaintiff through a New York bank. This action is not "based upon" Central Bank's establishment of other letters of credit issued in payment of other contracts or the other services performed by Morgan on behalf of Central Bank and unrelated to the Verlinden letter of credit.

▉▉▉ Whether one denominates the conduct of Central Bank and Morgan in the United States with respect to the Verlinden letter of credit "a regular course of commercial conduct" or "a particular transaction or act," the crucial question is whether it involves "substantial contact" with the United States within the meaning of the Act. We hold that it does not. The letter of credit, the breach of which is the basis of plaintiff's claim, does not constitute a commercial activity carried on in the United States by the defendant. The establishment of the letter of credit by the defendant in Nigeria was a single act performed there to provide payment if due under the cement contract. It did not involve substantial contact with the United States within the meaning of the Act.

Although Congress deliberately left to the courts the task of defining the nature and scope of the requisite contacts,[60] it provided some guidance. The legislative history makes plain that Congress intended to bestow jurisdiction in cases in which there is "a degree of contact *beyond* that occasioned simply by U.S. citizenship or U.S. residence of the plaintiff."[61] This passage clearly underscores the fact that the "commercial activity carried on in the United States" must be substantial to support jurisdiction. Not only does the plaintiff not meet that test, but the other contacts relied upon between Central Bank and the United States with respect to the Verlinden credit are insufficient to satisfy the required standard. Central Bank engaged Morgan to act as a correspondent and advising bank with respect to the Verlinden credit. All of Morgan's subsequent actions were consistent with that role, which never changed. When Central Bank established the credit, Morgan advised plaintiff and its Dutch bank of that fact. Thereafter, it telexed all correspondence, including notice of amendments to the credit and clarifications of its terms, to the parties.[62] It was prepared to accept appropriate shipping documents tendered by plaintiff or plaintiff's bank and to pay drafts against them on terms specified by Central Bank in the letter of credit and in subsequent amendments. Every piece of correspondence emanating from its office and sent to Verlinden, including a copy of the credit itself, indicated that Morgan act-

**58.** 28 U.S.C. § 1605(a)(2) (Supp.1979) (emphasis supplied). *See Harris v. VAO Intourist, Moscow*, 481 F.Supp. 1056, 1060 (E.D.N.Y. 1979) (citing cases and articles); *Paterson, Zochonis (U.K.) Ltd. v. Compania United Arrow, S.A.*, No. 77 Civ. 4470, slip op. at 3 (S.D.N.Y. January 30, 1980) (Sand, J.).

**59.** *Accord Harris v. VAO Intourist, Moscow*, 481 F.Supp. 1056, 1060–61 (E.D.N.Y.1979).

**60.** *House Report, supra* note 7, at 17; *reprinted* at 6616.

**61.** *Id.* (emphasis supplied).

**62.** The use by a foreign party of an agent within the United States to forward messages by telex between itself and another foreign party is not a sufficient contact upon which the Court may base jurisdiction in the United States. *East Europe Domestic Intern. Sales Corp. v. Terra*, 467 F.Supp. 383 (S.D.N.Y.1979).

ed solely as an advising bank and undertook no independent responsibility for guaranteeing the letter of credit. It functioned in a ministerial capacity, without exercising discretion or independent judgment.

From the beginning it was clear that the parties never regarded New York as a focal or end-point in the transaction. By its terms the letter of credit was to be "advised [by Morgan] through Slavenburg's Bank, Amsterdam." Both parties, by their actions, have diminished the importance of their own New York contacts to the transaction. Plaintiff has maintained throughout that while the parties never agreed to any contacts with the United States and the entire deal was to be performed in Europe and Africa, nonetheless, by unilaterally choosing to establish contacts with the United States, the defendant subjected itself to the jurisdiction of this Court. Defendant, on the other hand, maintains that although it utilized the services of a New York bank, it strictly circumscribed the depth and extent of its New York contacts. For example, it repeatedly instructed Morgan, in both the credit itself and in subsequent correspondence, not to undertake any independent liability for the transaction. During subsequent negotiations, when it changed that instruction and authorized Morgan to confirm the letter at Verlinden's expense, Central Bank acted only upon Verlinden's insistence; when Verlinden declined to accept the offer, the letter remained unconfirmed. Plaintiff's attempt to dissect Morgan's ministerial activities cannot destroy the fact that Morgan's function throughout was solely that of an advising bank. In short, whatever contacts there were with New York with respect to the subject matter of this litigation were trans-

itory and insubstantial;[63] accordingly, we hold that this Court is without jurisdiction under the first of the three commercial activities exceptions to the Act.

B. *"An Act Performed in the United States in connection with a Commercial Activity of the Foreign State Elsewhere"*

■ Verlinden next argues that Central Bank is subject to suit under the second exception to the Act. Essentially it contends that the repudiating instruction, which is the basis of its claim of anticipatory breach of the letter of credit, although issued in Nigeria, took effect only when received and acted upon by Morgan in New York. In plaintiff's words, "[t]he repudiating instructions had their effect and found their target in the U.S. not in Nigeria."[64] The fact that Morgan received the repudiating instruction in New York did not constitute an "act performed in the United States"; the repudiating act was performed at the place where the instruction was issued—Nigeria. Plaintiff's argument on this point is more properly addressed to the third commercial exception.

C. *"An Act . . . Outside the United States . . . that Causes a Direct Effect in the United States"*

■ Plaintiff's final contention is that Central Bank surrendered its immunity under this exception—by committing acts outside the United States that "cause[d] a direct effect in the United States." Although this section has principally been applied to activity causing tortious consequences,[65] the legislative history makes clear that it was

**63.** Judge Goettel reached this same conclusion under the New York long-arm statute in another of the Nigerian cement contract cases. *See National American Corp. v Federal Republic of Nigeria*, 425 F.Supp. 1365, 1370 (S.D.N.Y.1977). In that case, the facts pointed more strongly in favor of jurisdiction than they do here: plaintiff was a New York corporation; the credit was payable to it in New York through a New York bank; plaintiff sued under the New York long-arm statute, which only requires "minimum"

rather than "substantial" contacts to support jurisdiction.

**64.** Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss and for Summary Judgment, at 11 (emphasis supplied).

**65.** *See, e. g., Harris v. VAO Intourist, Moscow*, 481 F.Supp. 1056 (E.D.N.Y.1979); *Upton v. Empire of Iran*, 459 F.Supp. 264 (D.D.C.1978), *aff'd*, 607 F.2d 494 (D.C.Cir. 1979).

intended to have wider application.[66] However, this exception can only be invoked when a *"substantial"* effect within the territory "occurs as a *direct* and *foreseeable* result of the conduct outside the territory."[67] In applying this section courts have uniformly held that the locus of the injury is dispositive of jurisdiction;[68] indeed, that factor takes precedence over the citizenship of the victim. For example, even when the victim of a foreign state's tortious conduct is an American citizen injured abroad, the sovereign is protected by immunity and there is no jurisdiction in the American courts. In such cases the injury to the victim's bereaved relatives living in the United States is not sufficiently "direct" or "substantial" to support the assertion of federal jurisdiction.[69]

■ In the case at bar, while the "repudiation" was issued in Nigeria (an act outside the United States), its receipt by Morgan caused no "direct effect in the United States." Perhaps recognizing this, plaintiff in its continued effort to come within the exception relies upon *J. Zeevi & Sons v. Grindlays Bank (Uganda)*[70] in which the New York State Court of Appeals held that the repudiation by a foreign bank of a letter of credit advised through a New York bank had an injurious effect upon New York's reputation as "financial capital of the world, . . . [and] international clearinghouse and market place for a plethora of international transactions . . .."[71] This effect visited not upon the plaintiff but upon a constituency of unnamed strangers to this lawsuit, is at most speculative and remote.[72] Indeed, solicitude for New York's "preeminent financial position"[73] should induce the courts to forbear the exercise of jurisdiction in close cases. New York would be detrimentally served by a decision subjecting foreign customers of its banks to the in personam jurisdiction of American courts whenever they advise credits to foreign beneficiaries through American banks. It would not be unrealistic to suggest that foreign states, aware that the designation of American banks as advisors in letters of credit would in consequence subject them to in personam jurisdiction in the event of a claimed breach, would have little hesitancy or difficulty in designating banks in foreign lands. It could hardly have been the purpose of Congress to force the loss of such business upon the American financial community. We hold that the instruction of repudiation received by Morgan did not subject defendant to in personam jurisdiction under the third exception.

In urging jurisdiction under the third commercial exception, plaintiff relies principally upon two decisions, neither of which is

---

66. *House Report, supra* note 7, at 19; *reprinted* at 6618. Congress adopted by reference "the principles set forth in section 18, Restatement of the Law, Second, Foreign Relations Law of the United States (1965)." *Id.* The broad language of that section of the Restatement grants a state the power to "prescribe a rule of law attaching legal consequences" to conduct, whether tortious or otherwise, that occurs outside the jurisdiction and causes substantial, direct, and foreseeable effects within the jurisdiction.

67. *Id. See Harris v. VAO Intourist, Moscow,* 481 F.Supp. 1056, 1062–63 (E.D.N.Y.1979) (emphasis supplied).

68. *Carey v. National Oil Corp.,* 592 F.2d 673, 676 (2d Cir. 1979); *Harris v. VAO Intourist, Moscow,* 481 F.Supp. 1056, 1064–65 (E.D.N.Y. 1979); *Upton v. Empire of Iran,* 459 F.Supp. 264, 266 (D.D.C.1978), *aff'd,* 607 F.2d 494 (D.C. Cir. 1979). *Cf. Yessenin-Volpin v. Novosti*

*Press Agency, Tass,* 443 F.Supp. 849, 855 (S.D. N.Y.1978).

69. *Harris v. VAO Intourist, Moscow,* 481 F.Supp. 1056, 1065 (E.D.N.Y.1979) (citing cases); *Upton v. Empire of Iran,* 459 F.Supp. 264, 266 (D.D.C.1978), *aff'd* 607 F.2d 494 (D.C. Cir. 1979).

70. 37 N.Y.2d 220, 371 N.Y.S.2d 892, 333 N.E.2d 168, *cert. denied,* 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975).

71. *Id.* 37 N.Y.2d at 227, 371 N.Y.S.2d at 898, 333 N.E.2d 168, 172.

72. *Cf. ITT v. Cornfeld,* 619 F.2d 909 (2d Cir. 1980).

73. *J. Zeevi & Sons v. Grindlays Bank (Uganda),* 37 N.Y.2d 220, 227, 371 N.Y.S.2d 892, 898, 333 N.E.2d 168, 174, *cert. denied,* 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975).

dispositive here. First, Verlinden points to Judge Goettel's observation, made in a case with facts quite different from those of the instant action, that "[t]he breach of a letter of credit having a New York beneficiary, advised by and payable through New York banks, would appear to satisfy the last [of the three] criteria of 28 U.S.C. § 1605(a)(2) . . . ."[74] Apart from the fact that this is dictum, recognized as such by Judge Goettel, the plaintiff, the named beneficiary in the letter of credit, was a New York corporation. New York was the final destination for payment under that credit, the locus of the injury occasioned by the alleged breach of the credit, and the home state of the beneficiary. Thus, the act of anticipatory repudiation had a direct effect in New York. None of those factors obtains here. Although Judge Goettel's holding in that case actually was based upon pre-Immunities Act law, his dictum is consistent with those subsequent cases, already discussed, in which courts have held that the locus of the injury is crucial in determining whether jurisdiction exists under the third "commercial activity" exception of the Act.[75]

The second case upon which plaintiff relies is *J. Zeevi & Sons v. Grindlays Bank (Uganda)*,[76] which involved the wrongful repudiation by a Ugandan bank of an irrevocable letter of credit advised through a New York bank and in favor of an Israeli corporation. Jurisdiction was established by the attachment of assets held in New York by the defendant's bank, which was found to be its agent in New York. *Zeevi* is distinguishable from the case at bar in a multitude of respects. It was decided before the passage of the Immunities Act;

the decision was based solely on New York law; questions of personal jurisdiction, or of the reach of the long-arm statute, were not decided or even considered by the court in *Zeevi*. The court's precise holding was limited to the narrow conclusion that under section 1314 of the Business Corporation Law of New York, a cause of action for wrongful repudiation of a Ugandan bank's obligation "arose within" the state of New York. This conclusion was premised, at least in part, on the court's rather questionable assumption that the "parties, by listing United States dollars as the form of payment, impliedly" accepted the benefits and invoked the protection of New York law.[77]

Here, by contrast, we deal solely with the question of whether personal jurisdiction exists under the standard set by Congress. We find no indication that Morgan acted as Central Bank's agent. Although payment was prescribed in U.S. dollars, the parties never invoked, explicitly or by implication, the protection of New York law.[78]

■ Finally, even if *Zeevi* were applicable, there is reason to believe that its authority has been limited to its peculiar factual situation. In at least two subsequent decisions, New York courts have held that the establishment of a correspondent banking relationship between a foreign and domestic bank does not subject the foreign bank to the personal jurisdiction of the New York courts under the state's long-arm statute.[79] We reach the same conclusion with respect to federal jurisdiction under the Immunities Act. Defendant's acts with respect to the Verlinden letter of credit caused no direct, substantial, injurious ef-

**74.** *National American Corp. v. Federal Republic of Nigeria*, 448 F.Supp. 622, 639 (S.D.N.Y. 1978), *aff'd*, 597 F.2d 314 (2d Cir. 1979).

**75.** *See* note 68, *supra*.

**76.** 37 N.Y.2d 220, 371 N.Y.S.2d 892, 333 N.E.2d 168, *cert. denied*, 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975).

**77.** *J. Zeevi & Sons v. Grindlays Bank (Uganda)*, 37 N.Y.2d 220, 227, 371 N.Y.S.2d 892, 898, 333 N.E.2d 168, 174, *cert. denied*, 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975).

**78.** Judge Goettel also held that *Zeevi* was inapplicable to the question of whether personal jurisdiction exists; he distinguished that case on the same bases as those enumerated here. *See National American Corp. v. Federal Republic of Nigeria*, 425 F.Supp. 1365, 1370–71 (S.D. N.Y.1977).

**79.** *Amigo Foods Corp. v. Marine Midland Bank*, 39 N.Y.2d 391, 384 N.Y.S.2d 124, 348 N.E.2d 581 (1976); *Taub v. Colonial Coated Textile Corp.*, 54 A.D.2d 660, 387 N.Y.S.2d 869 (1st Dep't 1976).

fect in the United States. Thus, the defendant's immunity is not defeated under the third commercial exception to the Act.

### III

The Act contains another exception, invoked more rarely than those governing commercial activities, but which plaintiff urges is applicable here. Foreign states are not immune from the jurisdiction of the courts of the United States:

> in any case
>
> (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver. . . .[80]

There is no assertion in the case at bar that the defendant has explicitly waived its immunity;[81] instead, plaintiff argues that Central Bank has implicitly waived its immunity in two related respects. The cement contract signed by Nigeria and Verlinden contains the following provision:

> The construction, validity and performance of *this contract* shall be governed by the Laws of the Netherlands and all disputes of any nature whatsoever which may arise under, out of, in connection with, or in relation to *this contract* shall be submitted to the arbitration of the International Chamber of Commerce, Paris, France, in accordance with its Rules at the date thereof. [emphasis supplied]

Plaintiff contends that Nigeria's choice of a foreign forum for arbitration and of foreign law precludes it from asserting any immunity, on its own behalf or that of its instrumentalities, with respect to any issue connected with the Verlinden cement contract. Specifically, Verlinden contends that Nigeria's choice of Dutch law and a French tribunal constitutes a waiver of objection to American jurisdiction, and that this waiver is binding as well upon Central Bank, Nigeria's instrumentality charged with the task of making payments under the cement contract.

Some support for this view appears in the cryptic language of the Congressional report, which noted:

> With respect to implicit waivers, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract. An implicit waiver would also include a situation where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity.[82]

Moreover, at least one court has held, in one of the other cement contract cases, that Nigeria's choice of European laws and a European forum to resolve disputes constituted a waiver of its sovereign immunity in the American courts.[83] Even if that case were correct on the law, it is inapplicable to the facts here.[84]

---

**80.** 28 U.S.C. § 1605(a)(1) (Supp.1979).

**81.** Normally, such a waiver is accomplished by treaty or by the explicit language of a contract entered into with a private party. *See House Report, supra* note 7, at 18; *reprinted* at 6617.

**82.** *Id.* This single paragraph contains the legislative history's entire discussion of implicit waivers.

**83.** *Ipitrade International, S. A. v. Federal Republic of Nigeria,* 465 F.Supp. 824 (D.D.C. 1978).

**84.** *Ipitrade International, S. A. v. Federal Republic of Nigeria,* 465 F.Supp. 824 (D.D.C.1978) did not require a decision on the issue of im-

plicit waiver. The *Ipitrade* action was brought to enforce an arbitration award against Nigeria made by a French tribunal applying Swiss law. The District Court had subject matter jurisdiction of the enforcement action by virtue of a treaty to which the United States, France, Switzerland, and Nigeria all are parties. 9 U.S.C. §§ 201–208 (Supp.1980). The treaty explicitly federalizes all such enforcement actions, *id.* § 203, and sharply constricts the scope of review of arbitral awards. *Id.* § 207. By signing the treaty, Nigeria had explicitly waived its objection to such enforcement actions.

Here plaintiff, for reasons which are apparent, has decided not to sue upon its cement agreement with Nigeria. Instead it bases its claim upon the Verlinden letter of credit. But that instrument, unlike the contract, is devoid of any provision accepting foreign law for its interpretation, nor does it name any foreign tribunal for arbitration.

Plaintiff seeks to blur the distinctions between two separate obligations binding between different parties. The cement contract was signed by Nigeria's Minister of Defense on behalf of the Nigerian government; Central Bank is not a party to that agreement, which binds only Verlinden and Nigeria. By its very definition, the letter of credit is a separate and distinct obligation;[85] in this case, it bound only Central Bank, and not the Nigerian government. Nigeria's obligation under the contract was "*to establish*" the letter of credit in favor of Verlinden within a specified period of time. Central Bank's obligation under the letter of credit matured upon presentation of appropriate documents. Nigeria undertook no obligations under the letter of credit; nor Central Bank, under the contract. This is not a hypertechnical distinction. The contract indicates that to whatever extent, if at all, Nigeria waived its immunity by reason of the arbitration provision, it did so only with respect to the contract, not the credit. Plaintiff can hardly have been unaware of these distinctions when it chose to pursue its remedies against Central Bank under the credit, rather than against Nigeria under the contract.

Even if Nigeria's waiver of immunity under one contract were held to bind its instrumentality under a different obligation, we would nevertheless find no implicit waiver, for Nigeria itself has never implicitly accepted the jurisdiction of American courts. The Congressional history cited by the plaintiff is not dispositive of this issue, indeed, it is at most ambiguous. The comment in the Congressional report, previously mentioned, that the courts had found an implicit waiver "where a foreign state has agreed to arbitration in another country or . . . agreed that the law of a particular country" would apply,[86] does not necessarily constitute an endorsement of that result. More importantly, it is by no means clear that Congress intended, in referring to "*another* country" or "a *particular* country," to include a *third-party* country the adoption of whose law or forum by a foreign state as one of the contracting parties would operate as a waiver thereby subjecting the foreign state to jurisdiction in this country. It may be reasonable to suggest that a sovereign state which agrees to be governed by the laws of the United States—which is both "another country" and "a particular country"—has implicitly waived its ability to assert the defense of sovereign immunity when sued in an American court. But it is quite another matter to suggest, as did the Court in *Ipitrade*,[87] that a sovereign state which agrees to be governed by the laws of a *third-party* country—such as the Netherlands—is thereby precluded from asserting its immunity in an American court.

Although both of these interpretations may be consistent with the literal language of the single paragraph of legislative history that addresses implicit waivers, there are strong reasons to reject the latter view. By its peculiar mixture of substantive and procedural provisions, the Immunities Act confers personal jurisdiction over all foreign states not entitled to immunity (assuming that valid service has been effectuated). Proof of an implicit waiver absolutely de-

---

85. *See* Uniform Customs and Practice for Documentary Credits (1962 Rev.); General Provisions and Definitions § (c) ("Credits, by their nature, are separate transactions from the sales or other contracts on which they may be based and banks are in no way concerned with or bound by such contracts.")

86. *House Report, supra* note 7, at 18; *reprinted* at 6617. There is no indication as to which cases the legislators were referring, or even whether they were cases decided under American law by American courts.

87. *Ipitrade International, S. A. v. Federal Republic of Nigeria*, 465 F.Supp. 824 (D.D.C. 1978).

feats the assertion of sovereign immunity. If the language of the Act is applied literally, the result is that a foreign sovereign which has waived its immunity can be subjected to the personal jurisdiction of United States courts regardless of the nature or quality of its contacts with this country.[88]

Plaintiff's view, if adopted, would presage a vast increase in the jurisdiction of federal courts in matters involving sensitive foreign relations: whenever a foreign sovereign had contracted with a private party anywhere in the world, and chose to be governed by the laws or answer in the forum of any country other than its own, it would expose itself to personal liability in the courts of the United States. Verlinden and Nigeria could scarcely have foreseen this untoward result when they signed the contract; and it is unlikely that Congress could have intended it.

 Because the Act's waiver provision is written as broadly as it is, it is incumbent upon the Court to narrow that provision's scope. We need not now decide whether the Court would have personal jurisdiction over a foreign state whose only contact with this country occurs by virtue of a private agreement in which it adopts American law or an American forum. We only hold that when a foreign state agrees to submit its disputes with another, non-American private party to the laws of a third country, or to answer in the tribunals of such country, it does not implicitly waive its immunity to the jurisdiction of the courts of the United States. Because Nigeria has not waived the defense of sovereign immunity in the American courts, it necessarily follows that Central Bank has not either.

In sum, we find that none of the exceptions to the Act is applicable here. The motion of the defendant to dismiss the complaint for lack of personal jurisdiction under the Foreign Sovereign Immunities Act is granted.

So ordered.

**88.** There is reason to believe that Congress did not anticipate this problem at all. On the one hand the legislative history indicates that Congress intended the courts to exercise personal jurisdiction only over foreign states having sufficient contacts with the United States. See

House Report, supra note 7, at 13–14; reprinted at 6612. On the other hand, the statute it wrote permits the assertion of jurisdiction either when there are sufficient contacts (i. e., when one of the commercial activity exceptions has been met) or when there has been a waiver.