**L'EUROPEENNE de BANQUE, for itself and as Agent for SFE Banking Corporation Limited, Hongkongbank Ltd., Den Norske Creditbank (Luxembourg) S.A., Australia and New Zealand Banking Group Limited, Banco Pinto & Sotto Mayor, Norwest Bank Minneapolis, N.A., Credit Commercial de France S.A., Euro–Latinamerican Bank Limited, Nederlandse Credietbank, N.V., Privatbanken Limited, Banque Francaise du Commerce Exterieur, Banque Industrielle et Mobiliere Privee, S.A., Credit Commercial de France Paris, S.A., Plaintiffs,**

v.

**LA REPUBLICA de VENEZUELA, Juan Vincente Perez Sandoval, Sociedad Financiera de Comercio, C.A. (formerly named Sociedad Financiera Credival, C.A.), Ramon Carrasco Pintor, Inversiones Credival, C.A., Redline Management Corp., 5712 Management Corp., and Archway Management Corp., Defendants.**

No. 86 Civ. 7808 (KC).

United States District Court, S.D. New York.

Oct. 18, 1988.

Daryl Libow, Michael Strauss, Sullivan and Cromwell, New York City, for plaintiffs.

William D. Rogers, Arnold and Porter, Washington, D.C., Whitney Debevoise, Kenneth Handal, Arnold and Porter, New York City, for Republic and Pintor, Sociedad Financiera de Comercio, Invesiones Credival.

Howard B. Adler, Shea and Gould, New York City, for Juan Sandoval.

## MEMORANDUM OPINION AND ORDER

CONBOY, District Judge.

On November 6, 1981, the plaintiffs, a consortium of banks,[1] entered a deposit lending agreement with a Venezuelan bank, then known as Sociedad Financiera Credival, C.A., which, at an undetermined subsequent date was legally succeeded by Sociedad Financiera de Comercio, C.A., *see* Comp. para. 4, ("SFC"). Comp. para. 18. Plaintiff L'Europeenne de Banque ("LEB"),[2] has acted as agent for the con-

sortium. The consortium agreed to deposit, at the request of SFC, up to thirty million dollars (U.S.) with SFC. *See generally* Exhibit B to Affidavit of Michel Sperry, executed Oct. 10, 1986 (the "Deposit Agreement"). The consortium advanced the full amount to SFC. Comp. para. 18. The agreement provided for non-discretionary substitution of new deposits when certificates of deposit matured, subject to certain conditions not relevant here. In effect, the Deposit Agreement provided SFC with revolving credit. *See* Deposit Agreement clause 4.3. The Deposit Agreement contained no overall termination date.

The complaint alleges that beginning in or before March 1982, defendant Juan Vincente Perez Sandoval, who then controlled SFC either directly or indirectly through intermediary corporations, Comp. para. 4, embarked on a scheme to loot the assets of SFC and to defraud its creditors. *Id.* para. 22. The scheme did not appreciably affect the consortium until March, 1984, when SFC failed to make a payment due under the agreement. *Id.* para. 30. LEB, on behalf of the consortium, met with officers of SFC, including Perez Sandoval, to obtain assurances of a resumption of payments. *Id.* Perez Sandoval made sufficient assurances that LEB decided not to declare the entire debt in default and not to commence legal action. *See id.* Perez Sandoval subsequently made a series of false and misleading representations, including one for the provision of a "collateral package" as security for SFC's debts, which satisfied LEB and induced it to continue to forgo recourse to judicial remedies. *Id.* paras. 31–32. Perez Sandoval fled Venezuela in mid–1985. *Id.* para. 33.

As of June 3, 1985, Banco de Comercio, S.A.C.A. and its subsidiary, SFC, "formed part of one of the largest financial organizations in Venezuela." *See* Affidavit of Tomas E. Sanchez Rondon, executed Feb.

---

1. Plaintiffs Hongkongbank Ltd. and Norwest Bank Minneapolis, N.A., were not original members of the consortium. At an undetermined date, they substituted for two original members. *See* Exhibit B to Affidavit of Michel Sperry, executed Oct. 10, 1986.

2. At the time, this plaintiff was known as Banque Rothschild. The French Government nationalized Banque Rothschild in February 1982 and renamed it L'Europeenne de Banque. *See* Comp. para. 18.

13, 1987, at para. 5. On that date, Venezuela, acting through its Ministry of Finance, issued Resolution 244, declaring an "intervention" by Venezuela in the affairs of Banco de Comercio, S.A.C.A., SFC, and two affiliated credit organizations. *See* Affidavit of Manuel Simon Egana, executed Feb. 13, 1987, at para. 13 & Exhibit B.[3] The resolution granted to the "interventor," defendant Ramon Carrasco Pintor, a Vice President of the Deposit Guaranty and Bank Protection Fund, (the "Fondo"), *see id.* resolution second, all management powers.[4]

Carrasco Pintor operated SFC as an ongoing business for approximately fourteen months. The Fondo provided financial assistance worth approximately U.S. $452 million during that time. *See* Sanchez Rondon Feb. 13, 1987 Aff. at para. 12; Memorandum of Law of Defendant La Republica de Venezuela in Support of Motion to Dismiss at 7–8 & n. 7. Then, on July 29, 1986, Venezuela, through the Ministry of Finance, issued Resolutions 887 and 888, revoking the authorizations to function of, respectively, SFC and its parent, Banco de Comercio, S.A.C.A., and ordering their immediate liquidations. *See* Exhibit C to Simon Egana Aff.

The consortium, unsecured and unpaid, responded by filing this lawsuit on October 10, 1986. The defendants are Venezuela, SFC and another Venezuelan bank, Inversiones Credival, C.A., SFC's wholly-owned subsidiary, Perez Sandoval and Carrasco Pintor, and three New York corporations, alleged to be Perez Sandoval's alter egos, each of which has as its principal purpose to hold title to real property located in New York. *See* Comp. paras. 2–9. Claims are asserted under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1332(a)(2)–(4), 1391(f), 1441(d), 1602–1611 (1982) ("FSIA"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (1982 & Supp. IV 1986) ("RICO"), and common law. Jurisdiction is asserted under 28 U.S.C. §§ 1330, 1331, and 1332(a)(2), (4). At the time the complaint was filed, this Court, by the Honorable Robert W. Sweet, U.S.D.J., issued an order of attachment and temporary restraining order on the property in New York allegedly belonging to the New York corporations and Perez Sandoval.[5] Pending before the Court are plaintiff's motion to confirm the order of attachment, certain defendants' cross-motions to vacate the order of attachment and cancel Notices of Pendency, and certain defendants' motions to dismiss the complaint.

## JURISDICTION

It is incumbent on the court to determine whether it has subject matter jurisdiction over this action before it can address plaintiffs' motion to confirm the attachment. *See Gross v. Hougland,* 712 F.2d 1034, 1036 (6th Cir.1983) (federal court "must satisfy itself that it has subject-matter jurisdiction over the dispute before it addresses the merits of the claims"), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1281, 79 L.Ed.2d 684 (1984); *Rice v. Rice Found.,* 610 F.2d 471, 474 (7th Cir.1979) ("The initial inquiry in any suit filed in federal court must be whether the federal court possesses subject matter jurisdiction."); *Blessing v. United States,* 447 F.Supp. 1160, 1167 (E.D.Pa. 1978) ("jurisdictional issues must be re-

---

**3.** Such an action is permitted under the law of Venezuela when a bank or credit institution governed by the General Law of Banks and Other Credit Institutions "confronts a difficult situation," potentially harmful to depositors or creditors or the banking system, or when a bank or credit institution has repeatedly violated the provisions of various banking laws. *See* Exhibit A to Simon Egana Aff., General Law of Banks and Other Credit Institutions Art. 166.

**4.** The resolution states:
The interventor shall, for the performance of his duties herein entrusted, have the broadest powers of administration, disposition, inspection and supervision, including all the authority, powers and duties which the Law and the Charters and By–Laws intervened Banking Institutions confer on Shareholders Meetings, Boards of Directors and other corporate bodies of the Companies.
*See* Exhibit B to Simon Egana Feb. 13, 1987 Aff. resolution third.

**5.** The order of attachment and temporary restraining order were subsequently modified, only to the extent of reducing the amount of the undertaking plaintiff need post.

solved before other questions may properly be considered"); *cf. Visual Sciences, Inc. v. Integrated Communications Inc.*, 660 F.2d 56, 59 (2d Cir.1981) ("A court must have in personam jurisdiction over a party before it can validly enter even an interlocutory injunction against him.").

## A. Ripeness of the RICO Claim

■ Count Four of the complaint alleges a civil violation of RICO. In substance, the plaintiffs allege that Perez Sandoval, SFC, inversiones, and the three New York corporations committed various predicate racketeering acts designed to loot SFC, thereby "substantially impair[ing]" SFC's "ability to operate as a going concern," and rendered SFC "unable to repay LEB on a timely basis." *See* Comp. paras. 22–29, 33. Perez Sandoval acted to keep SFC's creditors from pursuing "legal remedies against him while he continued the process of looting [SFC]." *Id.* at para. 31. He made multiple fraudulent misrepresentations that "induced LEB to forgo recourse to judicial remedies necessary to insure timely repayment of its loans to" SFC. *See id.* at paras. 30–32. Plaintiffs claim to be injured financially by this conduct because SFC is unable to pay its creditors, including the syndicate. *See* Comp. para. 61.

The defendants assert that the plaintiffs lack standing to assert the RICO claim, relying on *Rand v. Anaconda–Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed. 2d 582 (1986). *Rand* involved a suit by shareholders of a corporation injured by racketeering activity. *See* 794 F.2d at 844. The Second Circuit held that the shareholders had no standing to assert such derivative claims. *See id.* at 849.

The plaintiffs in this action, however, are creditors of the injured corporation, not shareholders. The Second Circuit has recently distinguished *Rand* on this very ground. In *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir.1988), a creditor alleged that it was induced to accept a bankrupt debtor's plan of arrangement under which it received "only 17.5% of its allowed claim" after the individuals owning the cor-

porate debtor "fraudulently conceal[ed] from [the debtor]'s creditors a major asset." *See id.* at 1098. The creditor alleged that if it had "known of the fraudulent transfer of [the asset], [it] never would have consented to the reorganization plan." *Id.* at 1099. The debtor was involved in bankruptcy proceedings that continued through the date of the Second Circuit's decision. *See id.* at 1099.

The Second Circuit reversed the district court's conclusion that the creditor "had no standing 'to sue for any injury attributable to the depletion of [the debtor]'s corporate assets.'" *See id.* at 1100 (quoting district court opinion). The court stated that its decision was not contrary to its decision in *Rand. See id.* at 1101. The court explained that in holding that the shareholders of an injured corporation did not have individual standing to bring a claim under civil RICO, it

merely recognized a standing requirement applicable throughout corporate law: "An 'action to redress injuries to a corporation cannot be maintained by a shareholder in his own name but must be brought in the name of the corporation'" through a derivative action.

*Id.* at 1101. (quoting *Rand*, 794 F.2d at 849 (quoting *Warren v. Manufacturers Nat'l Bank*, 759 F.2d 542, 544 (6th Cir. 1985))).

Although the plaintiffs in *Rhoades* had standing to allege a RICO claim for their "[l]oss of a legitimate debt," *id.* at 1098, 1100–01, 1105, the court held that damages for such a claim were not then presently recoverable, because their accrual was speculative and their amount and nature unprovable. *See id.* at 1105–06. Because the debtor was still involved in bankruptcy proceedings even when *Rhoades* was on appeal, and the creditor "was injured by the identical transactions that injured the bankrupt corporation," *id.* at 1106, it was "impossible to determine the amount of damages that would be necessary to make plaintiff whole, because it [wa]s not known whether some or all of the fraudulently transferred funds w[ould] be recovered by the corporation." *Id.* at 1106. Therefore,

the court dismissed without prejudice the claim for relief "based on the lost-debt injury." No cause of action would accrue until the bankruptcy court completed its proceedings, at which time actual injury would be ascertainable. *See id.*

*Rhoades* is dispositive of plaintiffs' RICO claim. SFC is involved in liquidation proceedings. *See* Comp. para. 39. The only RICO injury alleged is the "lost-debt injury." *See* Comp. paras. 61–62. Therefore, on the authority of *Rhoades*, Count Four of the complaint is dismissed without prejudice.

### B. Sovereign Immunity

The FSIA "provides the district courts with both subject matter and personal jurisdiction over nonjury civil actions against foreign states, in actions which, pursuant to 28 U.S.C. §§ 1605–1607, foreign states are not immune. *Id.* § 1330." *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 500 F.Supp. 320, 322 (S.D.N.Y.1980), *rev'd on other grounds*, 647 F.2d 300 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). Venezuela claims entitlement to sovereign immunity. Plaintiff argues that at least one of three of the five exceptions to sovereign immunity provided by section 1605(a), waiver, commercial activity, or expropriation, *see* 28 U.S.C. § 1605(a)(1)–(3) (1982), is applicable. Under the FSIA, defendants bear the evidentiary burden of demonstrating that the exceptions are not applicable. *See Braka v. Bancomer, S.A.*, 589 F.Supp. 1465, 1467 (S.D.N.Y.1984), *aff'd*, 762 F.2d 222 (2d Cir.1985); H.R.Rep. No. 1487, 94th Cong., 2d Sess. 17, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6616.

Venezuela likens its actions, including the actions of the Fondo, to those undertaken from time to time by this country's Federal Deposit Insurance Corporation, appointed by the Comptroller of the Currency, and the Federal Savings & Loan Insurance Corporation, appointed by the Federal Home Loan Bank Board. "The regulation of a nation's financial institutions, the ordering and supervision of the intervention and liquidation of troubled components of the system, and the provision of protection to depositors are classic governmental functions." Memorandum of Defendant La Republica de Venezuela in Support of Motion to Dismiss at 19–21. On the other hand, plaintiff argues that Venezuela, through its intervention of SFC, engaged in a *de facto* nationalization of SFC.

■ While it is true that the term "intervention" has been equated with "nationalization" in cases resulting from the Cuban Revolution, *see, e.g., Menendez v. Saks & Co.*, 485 F.2d 1355, 1360 (2d Cir.1973), *rev'd on other grounds sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *Tabacalera Cubana, S.A. v. Faber, Coe & Gregg, Inc.*, 379 F.Supp. 772, 773–74 (S.D.N.Y.1974); *F. Palicio y Compania, S.A. v. Brush*, 256 F.Supp. 481, 483–84, 487–88 (S.D.N.Y.1966), *aff'd per curiam*, 375 F.2d 1011 (2d Cir.), *cert. denied*, 389 U.S. 830, 88 S.Ct. 95, 19 L.Ed.2d 88 (1967), "nationalization" implies permanency and profit motive. The Court finds neither to be suggested here. *See* Affidavit of Tomas E. Sanchez Rondon, executed April 27, 1987, at para. 4 ("As of April 24, 1987 the principal amount of [SFC]'s external debt was $163,933,156.00.").[6]

■ Nevertheless, the court must agree with plaintiff that Venezuela engaged in commercial activity by intervening in SFC's affairs. The circumstances of the period of

---

6. Although the usual rule is that a court considering a motion to dismiss the complaint is obligated to deem the complaint's allegations to be true, *see Joyce v. Joyce Beverages, Inc.*, 571 F.2d 703, 706 (2d Cir.), *cert. denied*, 437 U.S. 905, 98 S.Ct. 3092, 57 L.Ed.2d 1135 (1978), on a motion attacking the court's jurisdiction the court may resolve disputed factual issues, basing its conclusions on affidavits as well as pleadings. *Braka v. Bancomer, S.A.*, 589 F.Supp. 1465, 1468 (S.D.N.Y.1984), *aff'd*, 762 F.2d 222 (2d Cir.1985). *Texas Trading & Milling Corporation v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982), is not contrary. In *Texas Trading & Milling Corporation*, the Second Circuit merely stated that it was accepting the case in the posture presented to it, assuming the complaint's allegations to be true. *See id.* at 303 n. 6.

intervention nearly mirror those present in an early Eighth Circuit case, *Metropolitan Sav. Bank & Trust Co. v. Farmers' State Bank,* 20 F.2d 775 (8th Cir.1927), *cert. denied,* 276 U.S. 624, 48 S.Ct. 204, 72 L.Ed. 737 (1928). In that case, one bank sued another to recover on a certificate of deposit issued by the defendant. 20 F.2d at 775. At the time of suit the "defendant bank was being operated as a 'going concern' by an agent of the guaranty fund commission of the state of Nebraska." *Id.* at 775–76. The defendant moved to dismiss the complaint, asserting sovereign immunity. *See id.* at 776. The court noted the legislative intent that the new managers would "overcome the financial difficulties in which the bank was involved and finally turn it back to the management of its own officers." *Id.* at 778. The guaranty fund provided additional funds to keep the bank going. *See id.*

After summarizing two United States Supreme Court cases rejecting assertions of sovereign immunity on behalf of banks permanently owned by their respective sovereigns, *see id.* at 779–80, the court stated: "[I]t follows that the temporary operation of the bank through a state agency, without disturbing its corporate existence or identity, would not [enable the bank to claim sovereign immunity]." *Id.* at 780.

By its actions, Venezuela did engage in commercial activity [7] in these circumstances. If certain conditions are satisfied, subject matter jurisdiction exists under section 1605(a)(2).

A foreign state is not entitled to sovereign immunity if (1) the action is based on "a commercial activity carried on in the United States by the foreign state;" or (2) the action is based on "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere;" or (3) the action is based on "an

act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." *See* 28 U.S.C. § 1605(a)(2) (1982).

■ Plaintiffs first claim that by assuming management of SFC, Venezuela assumed oversight and management of the operations of SFC's second-tier subsidiaries, the three New York corporations. *See* Reply Affidavit of Michael Straus, executed April 13, 1987, at para. 4. From this, plaintiffs conclude that Venezuela conducted commercial activity in the United States, thereby subjecting itself to jurisdiction under the first alternative of section 1605(a)(2). *See* Plaintiffs' Reply Memorandum, dated May 1, 1987, at 11.

This argument is not persuasive. The statute states that the action must be "based upon" the commercial activity carried on in the United States. 28 U.S.C. § 1605(a)(2) (1982). This resembles the "transaction" of business clauses found in many long-arm statutes. *See Harris v. VAO Intourist, Moscow,* 481 F.Supp. 1056, 1061 (E.D.N.Y.1979). Plaintiff states that its action is based on Venezuela's failure to repay the certificates of deposit. *See* Plaintiff's Reply Memorandum, dated April 13, 1987 at 46; *id.* at 49; Comp. paras. 41–43, 63–65. This bears no relation to the management of real property, which is the principal purpose of the three New York corporations. *Cf. Harris,* 481 F.Supp. at 1057, 1061 (relationship between negligent operation of hotel in Moscow, resulting in fire causing death, and tourist agency operating in the United States "is so attenuated that this clause is not applicable").

■ Plaintiffs further argue that the other two alternative bases for jurisdiction under section 1605(a)(2) are satisfied. The act of repudiation, the order of liquidation,[8]

---

7. The court assumes that Venezuela and the Fondo are a single entity, a point not addressed by the parties. However, the court notes "that governmental instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,* 462 U.S. 611, 626–27, 103 S.Ct. 2591, 2600, 77 L.Ed.2d 46 (1983).

8. Plaintiffs never specify when or how repudiation occurred. Rather, plaintiffs speak of an ongoing repudiation. What is clear is that default occurred in 1984, *see* Comp. para. 30, and that the consortium, along with other creditors of SFC, expected to negotiate with the government, after the intervention, to arrange terms of full repayment. *See* Exhibit 10 to Straus Aff.

occurred in Venezuela. *See Exchange Nat'l Bank v. Empressa Minera del Centro del Peru S.A.*, 595 F.Supp. 502, 504 (S.D.N.Y.1984); *Verlinden B.V. v. Central Bank of Nigeria*, 488 F.Supp. 1284, 1298 (S.D.N.Y.1980), *aff'd*, 647 F.2d 320 (2d Cir. 1981), *rev'd on other grounds*, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). Therefore, the second alternative basis for jurisdiction contained in section 1605(a)(2) is not available to the plaintiffs.

It is thus necessary to determine whether Venezuela's repudiation of the debt caused "a direct effect in the United States." *See* 28 U.S.C. § 1605(a)(2) (1982). This exercise is "an enterprise fraught with artifice." *Texas Trading & Milling Corp.*, 647 F.2d at 312. The court must be mindful of "Congress's concern with providing 'access to the courts' to those aggrieved by the commercial acts of a foreign sovereign." *Id.*

Nonpayment of a debt payable in the United States to a United States company has been held to cause a direct effect in the United States. *See, e.g., Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1111 (5th Cir. 1985); *Texas Trading & Milling Corp.*, 647 F.2d at 312. The court does not deem it appropriate to apply that rule here. First, the Deposit Agreement states that payments are to be made to "the account of [LEB] for account of the [consortium members.]" *See* Deposit Agreement at clause 16.1. Second, it is not clear when Norwest Bank Minneapolis, N.A., the only United States bank participating in the consortium, became a member of the consortium. It may have joined after default occurred in 1984.

In *Texas Trading & Milling Corp.*, the Second Circuit expressly reserved the question whether failure to pay a foreign corporation in the United States created an effect in the United States. *See id.* The Second Circuit noted that its holding that a suit by a foreigner against a foreign state under the FSIA was unconstitutional, in

*Verlinden B.V. v. Central Bank of Nigeria*, 647 F.2d 320, 322, 330 (2d Cir.1981), *rev'd*, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983), prevented its consideration of the question. *See id.* at 312 n. 34. The district court had reached the statutory question and determined that nonpayment under these circumstances did not create a direct effect in the United States. *See Verlinden B.V.*, 488 F.Supp. at 1298.

This court concludes that nonpayment of a debt payable in the United States to a foreigner such as LEB does cause a direct effect in the United States. Two reasons lead to this conclusion. First, the Supreme Court's decision in *Verlinden B.V.* allows for this possibility, by allowing foreigners to sue foreign states in United States courts. *See* 461 U.S. at 491–97, 103 S.Ct. at 1970–73. The court notes parenthetically that the Supreme Court did not decide this particular question. *See* 461 U.S. at 498 & n. 23, 103 S.Ct. at 1973 & n. 23. Second, public policy supports this conclusion. One commentator has stated:

> Effects jurisdiction derives from a state's interest in protecting those within its borders and in governing events within its borders. Thus, to determine whether a corporation has sustained a direct effect within a particular state a court must inquire whether the corporation, by its activity vis-a-vis the potential forum state, sufficiently implicates that state's interest in protecting persons within its territory.

Note, *Effects Jurisdiction Under the Foreign Sovereign Immunities Act and the Due Process Clause*, 55 N.Y.U.L.Rev. 474, 512 (1980) (footnote omitted) [hereinafter *Effects Jurisdiction*].

In *Verlinden B.V.*, *supra*, the district court declared that there was no direct effect in the United States for reasons of public policy. To allow jurisdiction whenever credits were directed through American banks, said the court, would cause for-

---

(telex dated Feb. 18, 1986 expressing hope that forthcoming meeting between SFC's creditors and government officials will eventually produce "a solution which results in the full repayment of the foreign obligations of the Comercio

Group"). The court is led to conclude that the decision to liquidate SFC, which crystallized the possibility that the consortium might receive less than full payment, must constitute the act of repudiation.

eign states to divert business from the United States to banks in foreign lands. 488 F.Supp. at 1298. "It could hardly have been the purpose of Congress to force the loss of such business upon the American financial community." *Id.* Today public policy reflects a different emphasis:

> The United States has an interest in maintaining New York's status as one of the foremost commercial centers in the world. Further, New York is the international clearing center for United States dollars.... The United States has an interest in ensuring that creditors entitled to payment in the United States in United States dollars under contracts subject to the jurisdiction of United States courts may assume that, except under the most extraordinary circumstances, their rights will be determined in accordance with recognized principles of contract law.

*Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 521–22 (2d Cir.), *cert. dismissed*, 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985). LEB, which maintained an account in New York, and which was to be paid in United States dollars, *see* Deposit Agreement at clause 1.1 (defining dollars as "the lawful currency for the time being of the United States"); *id.* clause 16.1 ("All payments to be made by [SFC] under this Agreement or the Certificates of Deposit shall be made in Dollars."), is a creditor in whom the United States is interested. LEB's decision to contract for payment in New York "sufficiently implicates" the interest of the United States "in protecting persons within its territory," *see Effects Jurisdiction, supra,* at 512, to cause the court to conclude that Venezuela's repudiation has caused a "direct effect" in the United States.

Concerns Judge Weinfeld expressed in *Verlinden B.V.* are not ignored. Rather, they are addressed in the due process personal jurisdiction analysis the court must undertake as part of the jurisdictional analysis under the FSIA. *See* discussion *infra* at 122–25.

■ Although subject matter jurisdiction exists, the jurisdictional inquiry is not end-ed. "[T]he [FSIA] cannot create personal jurisdiction where the Constitution forbids it. Accordingly, each finding of personal jurisdiction under the FSIA requires, in addition [to a finding of subject matter jurisdiction], a due process scrutiny of the court's power to exercise its authority over a particular defendant." *Texas Trading & Milling Corp.*, 647 F.2d at 308; *see Gilson v. Republic of Ireland*, 682 F.2d 1022, 1028–29 (D.D.Cir.1982); *Decor by Nikkei Int'l, Inc. v. Federal Republic of Nigeria*, 497 F.Supp. 893, 905 (S.D.N.Y.1980). Unfortunately, the parties have not directed their affidavits towards this component of the jurisdictional inquiry. Thus, the court must judge only the allegations of the complaint.

The burden is on the plaintiff to demonstrate that the court has personal jurisdiction over the defendant. *See Lemme v. Wine of Japan Import, Inc.*, 631 F.Supp. 456, 459 n. 4 (E.D.N.Y.1986); *Guardino v. American Sav. & Loan Ass'n*, 593 F.Supp. 691, 694 (E.D.N.Y.1984). The plaintiff's allegations must be accepted as true for the purposes of this motion, *see Joyce v. Joyce Beverages, Inc.*, 571 F.2d 703, 706 (2d Cir.), *cert. denied*, 437 U.S. 905, 98 S.Ct. 3092, 57 L.Ed.2d 1135 (1978), and the court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" factual allegations of the complaint. *Retail Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746, 753 n. 6, 83 S.Ct. 1461, 1466 n. 6, 10 L.Ed.2d 678 (1963); *Pross v. Katz*, 784 F.2d 455, 457 (2d Cir. 1986); *Sacramento Valley Chapter of Nat'l Elec. Contractors Ass'n v. International Bhd. of Elec. Workers*, 632 F.Supp. 1403, 1406 (E.D.Cal.1986). However, it is not proper for the court to assume that the plaintiff "can prove facts that it has not alleged." *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983). Further, "legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." J. Moore, J. Lucas, & G. Grotheer, 2A *Moore's Federal Practice* para. 12.07[2.–5] at 12–63 to –64 (2d ed. 1987).

■ Preliminarily, the court declines to hold Venezuela bound by the agreement by SFC to consent to personal jurisdiction in this court. Forum-selection clauses are favored when they are part of "a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power." *The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 12–13, 92 S.Ct. 1907, 1914, 32 L.Ed.2d 513 (1972). Here, Venezuela did not engage in free negotiations with SFC's management regarding what obligations it was assuming when it intervened SFC. Rather, it responded to a financial crisis that could have had disastrous consequences for the national economy. Further, such clauses "should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." *Id.* at 15, 92 S.Ct. at 1916. Section 1605(a)(1) of the FSIA vests United States courts with subject matter jurisdiction over a foreign state in any case "in which the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1) (1982). The FSIA's implicit waiver clause is construed narrowly, as a matter of public policy. The courts have been chary of finding jurisdiction based on implicit waiver. *See Frolova v. U.S.S.R.*, 761 F.2d 370, 377 (7th Cir. 1985)(per curiam)("the implicit waiver clause of § 1605(a)(1) is narrowly construed"); *Colonial Bank v. Compagnie Generale Maritime et Financiere*, 645 F.Supp. 1457, 1461 (S.D.N.Y.1986) (same conclusion); *see also* 1 J. Moore, J. Lucas, H. Fink, D. Weckstein & J. Wicker, *Moore's Federal Practice* para. 0.66[2.–2] at 700.164 (2d ed. 1988)(in connection with determining what acts constitute implied

waiver of sovereign immunity by foreign states, "it is to be noted that in litigation involving an American state's immunity under the Eleventh Amendment the courts have recognized implied waivers, but on the whole have taken a cautious approach in defining the conduct that will result in a waiver").[9] Holding Venezuela to the forum-selection clause would contravene the public policy of construing the implicit waiver clause in section 1605(a)(1) narrowly.

Moreover, the consent to jurisdiction by SFC is ineffective against itself. Parties cannot by consent confer subject matter jurisdiction on the court. *See, e.g., California v. La Rue*, 409 U.S. 109, 112 n. 3, 93 S.Ct. 390, 394 n. 3, 34 L.Ed.2d 342 (1972); *Reale Int'l, Inc. v. Federal Republic of Nigeria*, 647 F.2d 330, 331 (2d Cir.1981). There is no jurisdiction over the plaintiffs' state law claims, because diversity of citizenship is not present. *See* discussion *infra* at 26–29. It would be incongruous to hold Venezuela bound by a consent to jurisdiction it never agreed to, when the consent to jurisdiction is not valid against the party that actually agreed to it.

Therefore, it becomes necessary to determine whether the plaintiffs have alleged facts demonstrating the existence of personal jurisdiction. The exercise of jurisdiction must comport with "traditional notions of fair play and substantial justice." *See Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). The only contacts of any defendants with the United States[10] alleged in the complaint

---

**9.** The court notes that in *Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.*, 760 F.2d 390 (2d Cir.1985), the court stated that Congress intended that the provision for implicit waivers be given a "broad reading." *Id.* at 393 n. 2 (dictum). Besides the fact that the statement was dictum, the court notes that the court in *Proyecfin de Venezuela, S.A.* merely cited two of the three examples of implied waiver provided in the FSIA's legislative history. *See id.* Courts have been reluctant to stray beyond the three examples provided in the legislative history. *See Frolova v. U.S.S.R.*, 761 F.2d 370, 377

(7th Cir.1985) (per curiam); *Colonial Bank v. Compagnie Generale Maritime et Financiere*, 645 F.Supp. 1457, 1461 (S.D.N.Y.1986). None of the three is present in this action.

**10.** Because the FSIA creates federal question jurisdiction, *see Verlinden B.V.*, 461 U.S. at 496–97, 103 S.Ct. at 1973, the due process clause of the fifth amendment, rather than that of the fourteenth amendment, controls. *See Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 293 (3d Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985); *see also Texas Trading &*

are: 1) the New York properties, which according to the complaint, Perez Sandoval acquired with funds he "systematically and unlawfully converted" from SFC or its subsidiary, Inversiones, Comp. para. 29; 2) Perez Sandoval's transactions with a Miami, Florida bank in connection with the purchase of shares in a Florida corporation, *see* Comp. paras. 24–28; and 3) payment by SFC to the syndicate was to occur in New York, Comp. para. 19. There is no allegation in the complaint that any representative of the government of Venezuela had any contact with the United States in this matter.

■ Regarding the first contact, Inversiones is alleged to be SFC's wholly-owned subsidiary, and also the sole shareholder of the three New York corporations which hold title to certain of the real property, allegedly as Perez Sandoval's alter egos. *See* Comp. paras. 6–9. For jurisdictional purposes, a parent-subsidiary relationship, such as that which exists between SFC and the three New York corporations, is insufficient, standing by itself, to establish personal jurisdiction over the foreign parent. Some additional factor is required, such as direct and indirect control of the local company, treating the subsidiary as a mere department, or as an agent for the parent. *See Bulova Watch Co. v. K. Hattori & Co.,* 508 F.Supp. 1322, 1334 (E.D.N.Y.1981).[11] Before an agency relationship will be held to exist, it must appear that the alleged agent acted in the forum " 'for the benefit of, and with the knowledge and consent of,'

the non-resident principal." *CutCo Indus. v. Naughton,* 806 F.2d 361, 366 (2d Cir. 1986) (quoting *Grove Press, Inc. v. Angleton,* 649 F.2d 121, 122 (2d Cir.1981)).

■ The complaint does not contain a single allegation that SFC directed the establishment of the New York corporations. Even assuming SFC's contacts can be attributed to Venezuela, there is no allegation in the complaint that Perez Sandoval established the New York corporations for SFC's benefit. Quite the contrary, the complaint clearly states that Perez Sandoval "unlawfully converted funds of [SFC] or Inversiones to his own use ... and used such funds to acquire, among other assets, the real properties." Comp. para. 29. No facts are stated indicating corporate approval of Perez Sandoval's actions. Thus, this is not a jurisdictional contact. *See Leasco Data Processing Equip. Corp. v. Maxwell,* 319 F.Supp. 1256, 1261–62 (S.D.N.Y.1970) (to satisfy due process in pleading personal jurisdiction over alleged principal not present in forum, complaint must contain "specific facts that show that the principal had requested the agent to perform purposeful acts in [the forum] for the principal's benefit"), *modified on other grounds,* 468 F.2d 1326 (2d Cir.1972). The fact that Venezuela now asserts ownership of the New York corporations and entitlement to all the real property situated in New York does not alter the court's conclusion. It would not comport with "traditional notions of fair play and substantial justice" to permit the exercise of personal

---

*Milling Corp.,* 647 F.2d at 314–15 & n. 37 (pre-*Verlinden B.V.* case applying same principle). Parenthetically, the court notes that the Supreme Court has not yet ruled on this issue. *See Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 113 n. *, 107 S.Ct. 1026, 1033 n. *, 94 L.Ed.2d 92 (1987). The contacts that are appropriate to consider are national in scope; "the proper inquiry in determining personal jurisdiction in a case involving federal rights is one directed to the totality of a defendant's contacts throughout the United States." *Max Daetwyler Corp.,* 762 F.2d at 293; *see Deak & Co. v. Ir. R.M.P. Soedjono (In re Deak & Co.),* 63 B.R. 422, 430 (Bankr.S.D.N.Y.1986); *see also* Lilly, *Jurisdiction Over Domestic and Alien Defendants,* 69 Va.L.Rev. 85, 130 (1983) (FSIA "makes it reasonably clear that national—not state—contacts are decisive" in personal jurisdiction analysis).

*Contra Pioneer Properties, Inc. v. Martin,* 557 F.Supp. 1354, 1358–61 (D.Kan.1983) (court considered only defendant's contacts with forum state in determining jurisdiction over action asserting federal question jurisdiction), *appeal dismissed,* 776 F.2d 888 (10th Cir.1985).

**11.** Although the cases being cited concern a state's exercise of jurisdiction, the analysis is similar to that being used, minimum contacts with the United States. *See Max Daetwyler Corp. v. R. Meyer,* 762 F.2d 290, 293–95 (3d Cir.1985) ("although the ... fifth amendment due process inquiry need not address concerns of interstate federalism, it must still consider the remaining elements of the minimum contacts doctrine as developed by *International Shoe* and its progeny").

jurisdiction over a principal who enters the forum merely to reclaim assets acquired without the principal's knowledge by a disloyal agent, when those assets do not give rise to the cause of action.

The second contact, the dealing with the Miami bank by Perez Sandoval, likewise is not a jurisdictional contact as against SFC and, through it, Venezuela. In that situation, as in the acquisition of the New York real properties, the complaint does not permit even the inference that Perez Sandoval acted at SFC's request, and for its benefit. The only permissible inference from the alleged facts is that Perez Sandoval acted to SFC's detriment.

The third contact with the United States is an agreement to make payments in the forum. In the absence of any other jurisdictional contacts, such a contact is not sufficient to confer personal jurisdiction over the payor. *See T.J. Raney & Sons v. Security Sav. & Loan Ass'n,* 749 F.2d 523, 524–25 (8th Cir.1984) (per curiam); *Dollar Sav. Bank v. First Sec. Bank,* 746 F.2d 208, 213–14 (3d Cir.1984); *cf. Chemco Int'l Leasing, Inc. v. Meridian Eng'g, Inc.,* 590 F.Supp. 539, 543 (S.D.N.Y. 1984) (guarantor of payment obligation to be performed in New York *may* be amenable to personal jurisdiction in that state, if exercise of jurisdiction comports with "fairness and substantial justice").[12]

If the court could reasonably infer other contacts with the United States from the complaint, such as negotiations in this country, *see Allied Bank Int'l,* 757 F.2d at 521; *Gilson,* 682 F.2d at 1028, the complaint might pass muster. The only reasonable inference the court can draw is that the negotiations between a French bank and Venezuela, or an agent of Venezuela, occurred outside the United States. Thus, there is no indication of "purposeful availment" by Venezuela "of the privilege of conducting activities within the" United States, by which Venezuela could be said to have invoked "the benefits and protections of [the United States'] laws." *See Asahi Metal Indus. Co.,* 480 U.S. at 109, 107 S.Ct. at 1031 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985)). In the final analysis, mindful that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field," *Asahi,* 480 U.S. at 115, 107 S.Ct. at 1035 (quoting *United States v. First Nat'l City Bank,* 379 U.S. 378, 404, 85 S.Ct. 528, 542, 13 L.Ed.2d 365 (1965) (Harlan, J., dissenting)); *see Bellante, Clauss, Miller & Partners v. Alireza,* 634 F.Supp. 519, 527 (M.D.Pa. 1985) ("a foreign nation presents a higher sovereignty barrier [to the exercise of personal jurisdiction] than that between two states"), the court concludes that this complaint fails to allege personal jurisdiction over defendant Venezuela. Therefore, Count Five of the complaint must be dismissed without prejudice.

## C. Diversity Jurisdiction

As the federal claim, RICO, has been dismissed, *see* discussion *supra* at 118–19, the only remaining basis for subject matter jurisdiction over all the defendants, except Venezuela, is diversity jurisdiction, 28 U.S.C. § 1332 (1982). Plaintiffs invoke both section 1332(a)(2) and (a)(4).

In considering whether diversity jurisdiction exists over Counts One, Two, Three and Six of the Complaint, the court looks at the pleading as a whole, not to the individual counts.

> Diversity jurisdiction ... cannot be meted out count-by-count. Section 1332 grants jurisdiction to federal courts where "the matter in controversy" is between diverse parties. 28 U.S.C. § 1332(a).... Use of the term "the matter," rather than "each individual count,"

12. In *Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.,* 760 F.2d 390 (2d Cir.1985), the court stated in dictum that a requirement that payments by one foreign company be made at the New York office of a foreign bank, to be transferred to an account maintained by another foreign entity in a different New York bank, "might be insufficient to sustain jurisdiction under" section 1605(a)(2) of the FSIA. *See* 760 F.2d at 391–92, 394 (dictum).

indicates that Congress required complete diversity as to the entire suit. *Medina v. Spotnail, Inc.*, 591 F.Supp. 190, 194 (N.D.Ill.1984).

The jurisdictional statute is to be strictly construed. *See Owen Equip. & Erection Co. v. Kroeger*, 437 U.S. 365, 377, 98 S.Ct. 2396, 2404, 57 L.Ed.2d 274 (1978); *Adorno Enters. v. Federated Dep't Stores*, 629 F.Supp. 1565, 1568 (D.R.I.1986). LEB is a foreign state. *See* 28 U.S.C. § 1603 (1982). Diversity jurisdiction would exist under section 1332(a)(4) if the New York corporations were the only defendants. However, section (a)(4) is not applicable to SFC, Inversiones, Carrasco Pintor, or Perez Sandoval. Section (a)(4) permits the assertion of jurisdiction only against defendants who are "citizens of a State or of different States." The statute does not mention "citizens or subjects of a foreign state" in section (a)(4), as it does in sections (a)(2) and (a)(3). Although an argument could be made that this provision, added as part of the FSIA, *see* 28 U.S.C. § 1332 amendments (1982), is intended to be the converse of that statute, which permits foreign plaintiffs to sue foreign states in United States courts, *see Verlinden B.V.*, 461 U.S. at 490–91, 103 S.Ct. at 1969–70, the court chooses to adhere to the plain meaning of section (a)(4). "Federal courts are required to 'scrupulously confine their own jurisdiction to the precise limit which the statute has defined.'" *Medina*, 591 F.Supp. at 194 (quoting *Healy v. Ratta*, 292 U.S. 263, 270, 54 S.Ct. 700, 703, 78 L.Ed. 1248 (1934)).

Moreover, LEB is not the only plaintiff. One of the banks, Norwest Bank Minneapolis, N.A., is a United States citizen. *See* Comp. para. 14. There is no indication that any of the other banks are "foreign states." The presence of these plaintiffs precludes the use of section 1332(a)(4). The court further notes that "suits by foreign states remain tied to the alienage concept." 1 J. Moore, J. Lucas, H. Fink, D. Weckstein & J. Wicker, *Moore's Federal Practice* para. 0.75[2] at 709.51 (2d ed. 1988). The presence of aliens as both plaintiffs and defendants destroys diversity jurisdiction under 28 U.S.C. section 1332(a)(2). *See* discussion *infra*. In this action, there are alien defendants. Therefore, section 1332(a)(4) is unavailable to plaintiffs.

The alternate ground for diversity jurisdiction pressed by plaintiffs is section 1332(a)(2). That section has been held to be unavailable when aliens are parties on both sides of the lawsuit. *See, e.g., Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 824 n. 2, 89 S.Ct. 1487, 1488 n. 2, 23 L.Ed. 2d 9 (1969) (dictum); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 790 (2d Cir.1980), *cert. denied*, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed. 2d 804 (1981); *International Shipping Corp. v. Hydra Offshore, Inc.*, 675 F.Supp. 146, 152 (S.D.N.Y.1987). Here, there are alien plaintiffs and defendants. Therefore, section 1332(a)(2) is not available to plaintiffs.

One basis for diversity jurisdiction not asserted by plaintiffs is section 1332(a)(3). That section provides for subject matter jurisdiction if the lawsuit is between "citizens of different States and in which citizens or subjects of a foreign state are additional parties." 28 U.S.C. 1332(a)(3) (1982). One plaintiff, Norwest Bank Minneapolis, N.A., is a Minnesota corporation. *See* Comp. para. 14. Three defendants are New York corporations. *See id.* paras. 6–8. Nevertheless, jurisdiction is not present under subsection (a)(3).

"[T]he inclusion of a citizen of a state as a party or of citizens of diverse states as parties cannot save jurisdiction of an action in which aliens are the principal adverse parties." 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3604 at 389 (2d ed. 1984); *see De Wit v. KLM Royal Dutch Airlines, N.V.*, 570 F.Supp. 613, 617 (S.D.N.Y.1983) ("Under § 1332(a)(3) the main suit must be between citizens of different states with aliens as additional parties."). Here, the principal adverse parties are LEB, SFC, and Venezuela. Even if Norwest Bank Minneapolis, N.A. and the other members of the consortium are considered principal adverse parties, the three New York corporations cannot by any stretch of the imagination be

considered principal adverse parties. Those corporations are named for the reason that they possess assets against which the plaintiffs hope to execute judgment. There is no factual allegation that the plaintiffs ever dealt directly with those corporations. In fact, the New York corporations are named defendants in only one of the six Counts of the complaint, the RICO Count that has been dismissed. The principal controversy here concerns the debt owed the plaintiffs on the Deposit Agreement. For these reasons, the court concludes that section 1332(a)(3) is not applicable.[13]

In conclusion, diversity jurisdiction does not exist. Further, the court, though it possesses the inherent power to do so, *see Neeld v. American Hockey League*, 439 F.Supp. 459, 462 (W.D.N.Y.1977), is unable to *sua sponte* dismiss any parties in order to preserve the court's jurisdiction. The aliens on both sides are indispensable. Therefore, Counts One, Two, Three, and Six must be dismissed without prejudice.[14]

### CONCLUSION

There is no subject matter jurisdiction over any of plaintiffs' six claims. For that reason, the action must be dismissed against all of the defendants. Also for that reason, the order of attachment and temporary restraining order entered on October 10, 1986, and modified on October 14, 1986, is vacated. *See Merrill Lynch Futures Inc. v. Kelly*, 585 F.Supp. 1245, 1249 (S.D.N.Y.1984) (to succeed on motion to confirm order of attachment granted pursuant to New York CPLR section 6211, plaintiff must establish, *inter alia*, the existence of a cause of action); N.Y. CPLR Rule 6212(a) (McKinney 1980) (same). The motion to cancel Notices of Pendency filed against certain properties is also granted. Dismissal of the action is made without prejudice.

The plaintiffs are granted leave to replead no later than December 16, 1988. In the event no amended complaint is filed by 5:00 p.m. on that date, the clerk of the court shall enter judgment dismissing the complaint without prejudice. *See Elfenbein v. Gulf & W. Indus.*, 590 F.2d 445, 450 (2d Cir.1978) (per curiam); *Mozes v. Welch*, 638 F.Supp. 215, 222 (D.Conn.1986).

SO ORDERED.

### SUPPLEMENTAL ORDER

On the court's own motion, that part of today's Memorandum Opinion and Order in this action vacating the order of attachment and temporary restraining order, and cancelling the Notices of Pendency filed against certain real properties, is stayed. The court takes this action in order to preserve fully the rights of plaintiffs to either attempt to replead the complaint herein or appeal the judgment of this court.

SO ORDERED.

---

**13.** This conclusion makes it unnecessary to determine whether Norwest Bank Minneapolis, N.A., was made a member of the consortium in an attempt to manufacture diversity jurisdiction, in violation of 28 U.S.C. § 1359 (1982).

**14.** Because subject matter jurisdiction does not exist, SFC's consent to jurisdiction in the Deposit Agreement is ineffective. *See* discussion *supra* at 123.