**TRANSATLANTIC SHIFFAHRTSKONTOR GmBh, Plaintiff,**

v.

**SHANGHAI FOREIGN TRADE CORPORATION,**
**Defendant.**

**No. 96 CIV. 2893(MGC).**

United States District Court,
S.D. New York.

March 13, 1998.

Keane & Marlowe by Christopher P. Keane, Mary Ann C. Marlowe, East Brunswick, NJ, for Plaintiff.

Brown & Wood LLP by I. Scott Bieler, Corinne A. Whitaker, New York, NY, for Defendant.

## OPINION

CEDARBAUM, District Judge.

This is an action brought by Transatlantic Shiffahrtskontor GmBh ("Transatlantic"), a

German corporation, to enforce three judgments entered by the Supreme Court of Hong Kong against Shanghai Foreign Trade Corporation ("SFTC"). SFTC moves to dismiss the complaint on the grounds of sovereign immunity, lack of personal jurisdiction, and failure to state a claim upon which relief can be granted. For the reasons discussed below, the complaint is dismissed.

## BACKGROUND

### SFTC and its Alleged Agent

According to the complaint, SFTC is an "agency or instrumentality" of the People's Republic of China ("China") within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1603. "Alternatively," the complaint pleads, SFTC is a "state-owned, separate legal enterprise . . . capable of suing and being sued in its own name and bearing independent legal liability." (Complaint ¶ 3.) In July 1984, SFTC entered into a "Cooperation Agreement" with Shanghai Municipal Metallurgical Bureau and Vincor Limited ("Vincor"), a Hong Kong company, pursuant to which a joint venture called Vincor Shipping Company Limited ("VSL") was established. (Id. ¶¶ 6–7.) Pursuant to the Cooperation Agreement, the complaint alleges, SFTC "acted as the principal and beneficial owner of VSL." (Id. ¶ 11.) VSL acted as the agent of SFTC, and was authorized to negotiate shipping deals, sell and purchase old or scrap vessels, engage in chartering and subchartering of vessels, issue bills of lading and generally engage in maritime transport. (Id. ¶¶ 11–12.)

### The Transatlantic Contracts With VSL

In 1984, Transatlantic contracted to charter its vessels from VSL, which was described to Transatlantic as the agent of SFTC, one of China's leading importers. In 1984 and 1985, after an initial test shipment of steel from Hamburg and Norway to Shanghai, Transatlantic transported several hundred thousand metric tons of various cargos to Shanghai in 21 shipments, pursuant to individual voyage charter parties and contracts of affreightment (the "Contracts") with VSL. (Id. ¶¶ 13–15.)

The Contracts and related invoices provided for the payment of freight, demurrage and despatch in United States dollars. Various "Rider Clauses" of the Contracts called for freight payments to be made payable to Transatlantic's correspondent bank in New York, and such payments were so made. (Id. ¶ 22.) The Contracts provided that all disputes were to be resolved by arbitration in Hong Kong in accordance with the laws of Hong Kong. (Id. ¶ 23.)

Transatlantic alleges that at all times during the performance of the Contracts, VSL was authorized by and acted as the agent of SFTC, and that SFTC was the ultimate beneficiary of the Contracts. Transatlantic further alleges that VSL expressly represented to Transatlantic that VSL was acting on behalf of SFTC. (Id. ¶¶ 16–17, 21.) Moreover, according to the complaint, SFTC specifically approved all the important provisions of the Contracts, including the Contracts' arbitration clauses and freight and demurrage rates. (Id. ¶ 19.) The complaint does not allege that SFTC was a signatory to the Contracts.

### The Demurrage Costs and Subsequent Arbitration

As a result of severe congestion in the port of Shanghai in 1984 and 1985, a majority of the ships operating under the Contracts were delayed—some for as long as six weeks—and VSL thereby incurred substantial demurrage in favor of Transatlantic pursuant to the terms of the Contracts. (Id. ¶ 24.) SFTC, which was to pay VSL for any demurrage pursuant to an alleged internal agreement between SFTC and VSL, failed to pay for the demurrage. VSL, in turn, failed to pay Transatlantic for the demurrage. (Id. ¶¶ 25–26.)

Between 1985 and 1989, Transatlantic pursued claims for demurrage and other claims against VSL under all 21 Contracts by way of arbitration in Hong Kong. (Id. ¶ 27.) SFTC was not named as a respondent in the arbitration proceedings. According to the complaint, however, SFTC retained Hong Kong solicitors to participate in the defense of Transatlantic's claims. (Id. ¶¶ 27–28.) Hearings on the disputed Contracts were held before a Hong Kong arbitration panel from December 12 to 15, 1988. (Id. ¶ 33.)

VSL, which had changed its name to Harlifax Limited ("VSL/Harlifax") in November 1987, declared voluntary liquidation on December 30, 1988, purportedly in anticipation of an adverse arbitration award. (*Id.* ¶¶ 30, 35.) In addition, VSL previously had made three transfers of capital to SFTC between October 1986 and November 1988. (*Id.* ¶ 37.) On June 30, 1989, the Hong Kong arbitrators issued an award of U.S. $793,984.91 against VSL/Harlifax and in favor of Transatlantic for Transatlantic's claims on two Contracts. (*Id.* ¶¶ 40, 41.)

### Actions in the Hong Kong Courts

After VSL/Harlifax went into liquidation, Transatlantic filed a proof of debt dated May 11, 1990 listing its outstanding claims against VSL/Harlifax. (*Id.* ¶ 46.) In March 1991, upon the application of Transatlantic, the Supreme Court of Hong Kong, High Court appointed the firm of Deloitte Touche Tomahatsu as liquidators to investigate "questionable circumstances" surrounding the voluntary liquidation of VSL/Harlifax. (*Id.* ¶ 43.) The liquidators commenced three legal actions against SFTC and the directors of VSL/Harlifax (*Id.* ¶ 45.) After SFTC failed to appear in the actions, default judgments were entered. (*Id.* ¶ 50.) An August 4, 1993 judgment in the amount of HK $4,771,886.57 (*i.e.,* Hong Kong dollars) was entered against SFTC for the amount awarded against VSL by the arbitrators on June 30, 1989. A September 24, 1993 judgment in the amount of HK $1,398,052.00 was entered against SFTC for monies transferred from VSL/Harlifax to SFTC. Finally, a May 31, 1994 judgment in the amount of HK $7,741,053.79 was entered against SFTC for the "amount due" under the remaining Contracts. The complaint sets the total U.S. dollar value of the three judgments at $1,782,419.11. (*Id.* ¶ 52.) According to the complaint, SFTC was found liable under the Contracts (including the amount reflected in the June 30, 1989 arbitration award) and was directed to indemnify VSL/Harlifax for all liabilities arising under the Contracts between VSL and Transat-

lantic because VSL had entered into the Contracts as SFTC's agent. (*Id.* ¶ 51–52.)

SFTC did not appeal the judgments within the time allotted under Hong Kong law, and has refused to satisfy the judgments. (*Id.* ¶¶ 53–54.) According to the complaint, the judgments are valid, final, conclusive and enforceable under Hong Kong law. (*Id.* ¶ 54.) Transatlantic, to whom VSL assigned its rights against SFTC (*Id.* ¶ 64), now brings this action to enforce in this court the three unsatisfied judgments.

### DISCUSSION

SFTC asserts several grounds in support of its motion to dismiss. First, SFTC argues that subject matter jurisdiction is lacking because it is immune from suit under the Foreign Sovereign Immunities Act.[1] SFTC further argues that it is not subject to personal jurisdiction in this forum. Finally, SFTC argues that Transatlantic fails to state a claim for relief because Article 53 of the New York Civil Practice Law and Rules ("CPLR"), under which Transatlantic seeks enforcement of the Hong Kong judgments, applies only to judgments of "foreign states." Hong Kong, SFTC contends, is not recognized by the United States as a "foreign state."

### Subject Matter Jurisdiction

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). The FSIA generally recognizes the immunity of foreign states and their agencies and instrumentalities from the jurisdiction of American courts except under specific circumstances as provided in 28 U.S.C. §§ 1605–1607. *See* 28 U.S.C. §§ 1330, 1604. 28 U.S.C. § 1330(a) states that the district courts have jurisdiction "of any non-jury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applica-

---

1. SFTC also argues that even if it is not an agency or instrumentality of China, there is no basis for admiralty jurisdiction, which the parties agree is the only possible ground for subject matter jurisdiction if the FSIA does not apply.

ble international agreement." 28 U.S.C. § 1604 provides, subject to existing international agreements, that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."

Sections 1605 to 1607 set out several exceptions to the immunity from suit recognized by the FSIA. Particularly relevant to this action are the exceptions which provide that a foreign state:

> shall not be immune from the jurisdiction of the courts of the United States or of the States in any case—(1) in which the foreign state has waived its immunity either explicitly or by implication ...; (2) in which the action is based ... upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(1) and (2). Transatlantic argues that both of the above exceptions to the FSIA apply here.

## A. Agency or Instrumentality

■ To enjoy immunity from suit under the FSIA, SFTC first must qualify as a "foreign state" within the meaning of that act. 28 U.S.C. § 1603(a) defines "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." Subsection (b) of § 1603 defines "agency or instrumentality of a foreign state" as:

> any entity—(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor create under the laws of any third country.

"Once the defendant presents a prima facie case that it is a foreign sovereign, the plain-

tiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir.1993). The ultimate burden of persuasion remains with the alleged foreign sovereign. *Id.*

■ Here, however, Transatlantic itself alleges that SFTC is an agency or instrumentality of China, and, alternatively, that it is a "state-owned, separate legal enterprise." (Complaint ¶ 3.) It is not seriously disputed that SFTC is an agency or instrumentality of China. These allegations are sufficient to establish, for purposes of this motion, that SFTC is a "foreign state" within the meaning of the FSIA.[2]

## B. Applicability of FSIA Exceptions

### 1. The Implied Waiver Exception

Transatlantic argues that China (and thus SFTC) implicitly waived immunity by becoming a signatory to the Convention on the Recognition and Enforcement of Arbitral Awards (the "Convention"). Transatlantic argues that this case is controlled by the Second Circuit's decision in *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala*, 989 F.2d 572 (2d Cir.1993). In *Seetransport*, a German company entered into a contract with a Romanian company that was an "agency or instrumentality" of the Romanian government. A dispute arose which was arbitrated in Paris pursuant to the contract. The Romanian company appealed to the Court of Appeals of Paris for annulment of the arbitration award, but the appeal was dismissed. The German company then filed an action in this court to enforce the arbitral award and to convert the decision of the Paris Court of Appeals into a United States judgment.

The Second Circuit held that the Romanian company had waived any sovereign immunity defense and explained that:

> when [the defendant] entered into a contract with [the plaintiff] that had a provi-

---

**2.** For this reason, Transatlantic's alternative argument that this court has admiralty jurisdiction over the action need not be addressed. Transat-

lantic concedes that admiralty jurisdiction is not available where the FSIA applies.

sion that any disputes would be submitted to arbitration, and then participated in an arbitration in which an award was issued against it, logically, as an instrumentality or agency of the Romanian Government—a signatory to the Convention—it had to have contemplated the involvement of the courts of any of the Contracting States in an action to enforce the award.

989 F.2d at 578–579. The court relied on the Convention's provision for recognition and enforcement of arbitration awards in any "Contracting state"—that is, any state that has ratified the Convention. *Id.; see Convention on the Recognition and Enforcement of Arbitral Awards,* Article III, at 9 U.S.C. § 201. Because the defendant was a signatory to the Convention, the court held that by entering a contract containing an arbitration provision, it had implicitly waived sovereign immunity with respect to actions to confirm arbitration awards under the contract.

The court then dismissed the claim for enforcement of the arbitral award pursuant to the Convention, because it was barred by the statute of limitations. 989 F.2d at 581. The court also found, however, that the separate claim to convert the Paris Court of Appeals judgment into a United States judgment was "within the scope" of the waiver of sovereign immunity "because the cause of action is so closely related to the claim for enforcement of the arbitral award." 989 F.2d at 583. It therefore remanded the case for a determination of whether the Paris judgment was enforceable under New York CPLR § 5302.

By the same logic, Transatlantic argues, its claims are "closely related" to enforcement of the Hong Kong arbitral awards. China is a signatory of the Convention and therefore SFTC should be deemed to have waived its sovereign immunity defense with respect to those claims.

SFTC argues that the waiver principle of *Seetransport* cannot apply because SFTC was not a party to the Contracts, no arbitration award was rendered against it, and the judgments in this case are not "closely related" to a claim for enforcement of an arbitral award, as was the judgment in *Seetransport.* Transatlantic responds that VSL entered the

Contracts on behalf of SFTC, that SFTC was the disclosed principal of VSL and that an agency relationship can bind a principal to an arbitration agreement. Thus, Transatlantic argues, the judgment relating to the arbitration agreement was in reality a judgment confirming an arbitration award, similar to the judgment in *Seetransport.* With respect to the other judgments, Transatlantic contends that since the fraudulent transfers and liquidation were an attempt by SFTC and VSL to avoid the consequences of arbitration and the arbitration agreement, the judgments preventing that kind of enrichment based on fraud are related to the arbitration agreement. Therefore, Transatlantic argues, the waiver of sovereign immunity encompasses the claims on which all three judgments are based.

■ SFTC's argument against waiver is persuasive. In *Seetransport,* the plaintiff sought conversion of a foreign judgment that dismissed an action to vacate an arbitration award. As the Second Circuit noted, that judgment was effectively a judgment recognizing and enforcing the arbitration award. 989 F.2d at 582. In that case, however, the parties to the arbitration agreement were undisputed. There was no question that arbitration had been commenced, and the award rendered, against the defendant itself.

Here, by contrast, SFTC was not a signatory of the Contracts, Transatlantic did not initiate arbitration proceedings against SFTC, and no arbitration award was rendered against SFTC. As a result, even the Hong Kong judgment dated August 4, 1993 was not a simple confirmation of an arbitration award. The supposed "enforcement" of the arbitration award by the Hong Kong court required an inquiry into whether SFTC had an obligation to indemnify VSL. This inquiry went far beyond the simple confirmation of an arbitration award addressed by the *Seetransport* court.

Moreover, only one of the three judgments, the August 4, 1993 judgment, was based on an arbitration award. The second judgment was based on allegedly fraudulent transfers from VSL to SFTC before VSL was liquidated. The third judgment was

based on Contracts for which no arbitration awards had been issued because of the liquidation of VSL. These latter judgments are not "closely related" to enforcement of an arbitration agreement within the meaning of *Seetransport.*

### 2. The Commercial Activity Exception

■ The third prong of 28 U.S.C. § 1605(a)(2) provides that a foreign state is not immune from the jurisdiction of American courts in any case "in which the action is based upon ... an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." To invoke subject matter jurisdiction under this prong of the "commercial activity" exception, an action must be (1) based upon an act outside the territory of the United States; (2) that was taken in connection with a commercial activity of the defendant outside this country; and (3) that caused a direct effect in the United States. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992).

In *Weltover,* the Supreme Court held that the "direct effect" element was satisfied where a contract provided for the payment of funds to a New York bank, and that payment did not occur. "Because New York was ... the place of performance for [defendant's] ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." 504 U.S. at 619. Citing *Weltover,* Transatlantic argues that the "commercial activity" exception applies because this action is based upon SFTC's breach of the Contracts—specifically, its failure to make the demurrage payments that were supposed to be paid, pursuant to the Contracts, to Transatlantic's New York bank.

■ Unlike the contract in *Weltover,* however, the Contracts in this case do not require the demurrage payments at issue to be made to plaintiff's New York bank account. The Contracts provide that "freight" is to be paid in New York, but make no

reference to the place of payment of demurrage. (Complaint ¶ 22 and Ex. 17.) There is no allegation in the complaint that VSL or SFTC failed to make any freight payments required by the Contracts. At oral argument, counsel for Transatlantic argued that demurrage payments are merely a type of freight payments. The Contracts, however, list "freight" and "demurrage" separately. Absent a contractual requirement that demurrage be paid in New York, the nonpayment of demurrage in New York is not a "direct effect" in the United States within the meaning of the FSIA. *See International Housing Ltd. v. Rafidain Bank Iraq,* 893 F.2d 8, 12 (2d Cir.1989) (no direct effect in United States where party directed that payment be made in New York, but payment in New York was not specifically required by contract). Thus, any nonpayment of demurrage by SFTC did not have a "direct effect" in the United States.

Furthermore, review of the Contracts' "Rider Clauses" attached to the complaint shows that the New York account that was designated for the payment of freight was not the ultimate place of payment. Rather, the designated New York account is merely a correspondent account, as Transatlantic acknowledges. (Complaint ¶ 22.) The Rider Clauses provide that freight is "payable to Northern Trust International, New York ... in favor of Deutsch–Skandinavische Bank AG, Hamburg/Transatlantic Shiffahrtskontor GMBH, Hamburg, under telex advice to Deutsch–Skandinavische Bank AG, Hamburg." Addressing a similar situation involving a New York correspondent account in *International Housing, supra,* the Second Circuit observed that the New York bank's role "was that of a passive conduit indifferent to the nature or terms of the underlying transaction." 893 F.2d at 12.

For the foregoing reasons, the "commercial activity" exception to the FSIA is inapplicable and SFTC is entitled to sovereign immunity from this action.

### Personal Jurisdiction

Even if one of the exceptions to the FSIA applied in this case, dismissal would be required because Transatlantic has not made a

prima facie showing that this court has personal jurisdiction over defendant.

The Second Circuit has held that personal jurisdiction under the FSIA "requires ... a due process scrutiny of the court's power to exercise its authority over a particular defendant." *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).[3] "Due process requirements are satisfied when in personam jurisdiction is asserted over a nonresident corporate defendant that has certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (citing *International Shoe Co. v. State of Wash.*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)) (internal quotations omitted). According to the Second Circuit, the "minimum contacts" test requires examination of the extent to which defendants have availed themselves of the privileges of American law, the extent to which litigation in the United States would be foreseeable, the inconvenience to defendants in litigating in the United States and the countervailing interest of the United States in hearing the suit. *Texas Trading*, 647 F.2d at 314. The Supreme Court has emphasized that minimum contacts must have a basis in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Jurisdiction may be based on contacts related to the suit in which jurisdiction is sought ("specific jurisdiction"), or general contacts with the forum not related to the suit ("general jurisdiction"). *Helicopteros Nacionales*, 466 U.S. at 414–415. However, "[w]here a claim against

a foreign defendant does not arise out of the defendant's contacts with the forum, the exercise of personal jurisdiction over the defendant will be consistent with due process only if the defendant's contacts with the forum state are 'continuous and systematic.'" *Volkswagen De Mexico*, 768 F.Supp. at 1029 (citing *Helicopteros Nacionales*, 466 U.S. at 415–416); *see also Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 568 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996).

Plaintiff bears the burden of establishing the Court's personal jurisdiction over the defendant. *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986); *Longwood Resources Corporation v. C.M. Exploration Co.*, 988 F.Supp. 750, 751 (S.D.N.Y.1997); *Emmet, Marvin & Martin v. Maybrook, Inc.*, 1990 WL 209440, at *2 (S.D.N.Y.1990). But where a motion brought under Rule 12(b)(2) is decided without an evidentiary hearing, plaintiffs need only make a prima facie showing that jurisdiction exists. *Longwood*, 988 F.Supp. at 751. All pleadings and affidavits are construed in the light most favorable to the plaintiffs, and all doubts are resolved in their favor. *CutCo*, 806 F.2d at 365; *Longwood*, 988 F.Supp. at 751. However, "legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." *L'Europeenne de Banque v. La Republica de Venezuela*, 700 F.Supp. 114, 122 (S.D.N.Y. 1988).

## A. Specific Jurisdiction

Transatlantic argues that there is both specific and general jurisdiction over SFTC in this forum. With respect to specific jurisdiction, Transatlantic points to two contacts with the United States. First, under the Contracts, freight charges were payable to Transatlantic's account at its New York correspondent bank. The required freight payments were made to the New York bank

---

3. Courts similarly apply due process "minimum contacts" analysis to the exercise of personal jurisdiction over defendants in admiralty cases. *See, e.g., United Trading Co. v. M.V. Sakura Reefer*, 1996 WL 374154, at *2 (S.D.N.Y.1996); *Volkswagen De Mexico, S.A. v. Germanischer*

*Lloyd*, 768 F.Supp. 1023, 1029 (S.D.N.Y.1991). Thus, the same personal jurisdiction analysis would apply even if SFTC were not entitled to sovereign immunity and admiralty jurisdiction were invoked.

prior to VSL's breach of the Contracts. (Complaint ¶ 22.) Second, according to the complaint, among the documents in the "Creditors' Voluntary Winding Up" of VSL/Harlifax was a "Statutory Declaration" which was executed before a British Consular Officer in New York. (*Id.* ¶ 36.) Transatlantic contends that this declaration was part of SFTC's fraudulent attempt to avoid liability to Transatlantic under the Contracts.

■ The execution of the "Statutory Declaration" in New York is of no jurisdictional significance. Transatlantic correctly points out (and SFTC does not dispute) that "actions relevant to the transaction by an agent on defendants' behalf" can be imputed to the defendant to support personal jurisdiction. *Texas Trading*, 647 F.2d at 314. However, there is no allegation that the liquidation of VSL/Harlifax, or the execution of the "Statutory Declaration" in New York, were acts within the scope of the purported principal-agent relationship between VSL/Harlifax and SFTC. Thus, the execution of the document in New York by VSL/Harlifax does not support the exercise of personal jurisdiction over SFTC.

■ In any event, even if these contacts were to be imputed to SFTC, they are not sufficient to support a finding of personal jurisdiction. First, the requirement that freight payments be made to another party's New York bank account does not provide an adequate basis for personal jurisdiction. The mere agreement to pay funds to a bank account in New York does not establish constitutionally sufficient minimum contacts with New York. *L'Europeenne*, 700 F.Supp. at 125. Indeed, even a defendant's maintenance of a bank account in New York, absent special circumstances, does not satisfy the due process requirement of minimum contacts. *United Trading Co.*, 1996 WL 374154, at *5. And, the "Statutory Declaration" of VSL's liquidation that is alleged to have been executed in New York also is insufficient to support personal jurisdiction over SFTC. The complaint merely alleges that VSL/Harlifax executed a document in New York related to the company's voluntary liquidation in Hong Kong. There is no allegation that the document was filed with any governmental

agency in New York, or that anything other than mere happenstance caused the document to be executed in New York. This does not amount to the purposeful availment "of the privilege of conducting activities" in New York "invoking the benefits and protections of its laws." *Burger King Corp.*, 471 U.S. at 475. Even when combined, these two contacts do not provide a basis for this court's exercise of personal jurisdiction over SFTC.

### B. General Jurisdiction

■ Transatlantic also argues that SFTC has contacts in addition to those described above that give rise to general jurisdiction. Transatlantic maintains, and SFTC does not dispute, that contacts with the United States as a whole, rather than merely New York, should be evaluated to determine whether general personal jurisdiction in the United States exists. *See Texas Trading*, 647 F.2d at 314 (in action under FSIA, "the relevant area in delineating contacts is the entire United States, not merely New York").

■ Transatlantic alleges several general contacts by SFTC with the United States. First, Transatlantic alleges that SFTC owns 70% of a New York corporation called Shantra (N.Y.), Inc. ("Shantra New York"), and that Shantra New York is an "agent" of SFTC. Among the stated purposes of Shantra New York, according to the company's certificate of incorporation, are to engage in the import and export business as principal or agent, to carry on the business of agents and to conduct a general agency business. The certificate of incorporation, however, does not indicate any particular entity or person for whom Shantra New York is to act as agent. Shantra New York has "intercompany connections" in the form of "trading connections" with SFTC, and its chairman and president "is or was" the general manager of SFTC. (Complaint ¶¶ 57–62.) Transatlantic further alleges that SFTC engages in worldwide commercial activities, has been credited with importing more than one third of Shanghai's total imports and has established a Sino–U.S. joint venture foreign trade company. (*Id.* ¶ 63.) SFTC, according to documents attached to the complaint, describes itself as a "comprehensive foreign

trade enterprise" that produces millions of United States dollars in revenue each year and enjoys "worldwide" commercial relations with over 1,500 merchandisers throughout the world. (*Id.*, Ex. 42) Transatlantic argues that under these circumstances, it "defies credibility" to suggest that there are insufficient contacts with the United States.

■ These allegations do not make out a prima facie showing of the continuous and systematic general business contacts required to support general personal jurisdiction over SFTC. First, the presence of a subsidiary in the United States does not, standing alone, create personal jurisdiction. An additional factor, such as control of the local company or treatment as a mere department or agent of the parent, is necessary. *L'Europeenne,* 700 F.Supp. at 124. The vague allegations in the complaint that Shantra New York has "trading connections" with SFTC, and that among its stated purposes are to act as principal or agent in the import and export business and to conduct a general agency business, do not support an inference that Shantra New York is a mere department or agent of SFTC. Moreover, the conclusory allegation that Shantra New York is the agent of SFTC is inadequate on its face and is not entitled to a "presumption of truthfulness." *Id.* at 122. Transatlantic has failed to allege facts supporting a prima facie showing of agency, and therefore the presence of Shantra New York is not sufficient for personal jurisdiction over SFTC.

For similar reasons, the vague allegations that SFTC is a major Chinese importer that engages in worldwide commercial activities and enjoys commercial relations with many other countries throughout the world are inadequate to show that SFTC has continuous and systematic contacts with the United States. These allegations do not connect SFTC to the United States, but only establish that it is an international trading company. Even if it were inferred from these allegations that SFTC has commercial relations with companies present in the United States, that fact would not lead to the conclusion that SFTC is engaged in the kind of continuous and systematic business contacts required by the Supreme Court to support

general personal jurisdiction. *See Helicopteros Nacionales,* 466 U.S. at 418 (holding that "mere purchases, even if occurring at regular intervals, are not enough to warrant ... assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions").

In sum, Transatlantic, a German company, has failed to present a prima facie showing that SFTC, an agency or instrumentality of the Chinese government, is subject to either specific or general personal jurisdiction in New York.

### Conclusion

For the foregoing reasons, SFTC's motion to dismiss the complaint for lack of subject matter jurisdiction and personal jurisdiction is granted. Because the complaint is dismissed on jurisdictional grounds, I do not address SFTC's argument that the complaint fails to state a claim upon which relief can be granted.

SO ORDERED.